**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DR. WILLIAM BONGIORNO, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM BAQUET, FRANK M. DELAPE, CHARLES GIORDANO, PHYLLIS HENDERSON, BOB SAGARINO, BRUCE INGLIS AND PREMCHAND BEHARRY individually and in their respective corporate capacities, FORDHAM FINANCIAL MANAGEMENT INC, FORDHAM HOLDINGS GROUP INC., SIX DIAMONDS RESORTS INTERNATIONAL INC., SIX DIAMONDS RESORTS INTERNATIONAL S.A., LANDBRIDGE HOLDINGS INTERNATIONAL, S.A., and THINKEQUITY, a Division of FORDHAM FINANCIAL MANAGEMENT,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **CIVIL ACTION NO.**<br><br>CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, DR. WILLIAM BONGIORNO (hereinafter referred to as either "Plaintiff" or "Dr. Bongiorno"), by his attorneys, JOSEPH R. BONGIORNO & ASSOCIATES, P.C., alleges the following based upon information and belief and the investigation conducted by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and on behalf of the Defendants and information readily obtainable on the Internet.

### JURISDICTION AND VENUE

1.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule l0b-5 promulgated thereunder (17C.F.R. §240.10b-5) and Investment Company Act § 36 (b) as well as Racketeer Influenced and Corrupt Organizations Act of 1970 ("Rico") (Title 18 USC §§ 1961, 62, 63 and 1964)

2.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331 and Rico and/or diversity of jurisdiction.

3.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Many of the participants maintain offices in the State of New York.

4.      In connection with the acts, conduct and other wrongs alleged in this

complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

5.      Plaintiff purchased securities and provided loans to Defendants in reliance on their false assurances and upon follow up as to the status of his investments with Defendants based upon their continuing false representations maintained his investment positions with Defendants to his great detriment.

## PARTIES

6.      Defendant, WILLIAM BAQUET, was an Officer, Director or Beneficial Owner or Investment Advisor of or with the Defendant companies at all relevant times. defendant, FRANK M. DELAPE, was an Officer, Director or Beneficial Owner of the Defendant corporate entities listed herein at all relevant times.

7.      Defendant, CHARLES GIORDANO, was a beneficial owner and an investment advisor or broker dealer or agent associated with the said Defendant corporate entities at all relevant times.

8.      Defendant, PHYLLIS HENDERSON, was, Compliance Officer for the defendant, FORDHAM FINANCIAL MANAGEMENT, at all relevant times.

9.      Defendants, WILLIAM BAQUET, FRANK DELAPE, CHARLES GIORDANO, BOB SAGARINO, BRUCE INGLIS and PREMCHAND BEHARRY are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the various corporate entities, possessed the

power and authority to control the contents of said defendant corporate entity reports, press releases and presentations to investors, i.e., the market. Individual Defendants were provided with copies of the various corporate reports and correspondences alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

10.     Defendant, FORDHAM FINANCIAL MANAGEMENT, INC., is a registered broker-dealer and member of the National Association of Securities Dealers with a principal place of business located at 17 Battery Place, Suite 643, New York, NY 10004.  Said Defendant touts that it "is registered with the United States Securities and Exchange Commission ("SEC") and is a member of the New York Stock Exchange ("NYSE"), The Financial Industry Regulatory Authority ("FINRA") and the Securities Investor Protection Corporation ("SIPC")." Defendant, FORDHAM FINANCIAL MANAGEMENT, INC. is registered to do busines in New York with the New York Department of State since January 24, 1996 as a Foreign

4

Business Corporation incorporated in the State of Colorado.

11.    Defendant, FORDHAM HOLDINGS GROUP INC., despite not being registered to do business in New York State with the New York State Department of State according to Reg-D filings with the SEC, is a Foreign Business Corporation incorporated in the State of Delaware with offices at 17 Battery Place, Suite 643, New York, NY 10004 and according to filings owns defendant, FORDHAM FINANCIAL MANAGEMENT, INC.

12.    Defendant, SIX DIAMONDS RESORTS INTERNATIONAL, S.A. is a Panamanian Society Company that according to a Form D filed with the SEC maintains executive offices at 700 Gemini Avenue, Suite 100, Houston, TX 77058 and describes its business therein as "the Company intends to attempt to develop world class real estate resorts and communities in Panama for tourism and retirement destinations" with both defendants, FRANK DELAPE and WILLIAM BAQUET listed as beneficial owners. Defendant, SIX DIAMONDS RESORTS INTERNATIONAL, INC., is a Cayman Island corporation which according to a Form D filed with the SEC on March 4, 2020 maintains its executive offices at 17 Battery Place, Suite 643, New York, NY 10004. A 2014 promissory note issued by the Cayman Islands entity alludes to its Panamanian subsidiary as being defendant, SIX DIAMONDS RESORTS INTERNATIONAL, S.A.

13.    Defendant, LANDBRIDGE HOLDINGS INTERNATIONAL, S.A., is a company incorporated in Panama on July 25, 2007. An Opinion on Summary

Judgement entered in the United States District Court Southern District of Texas on April 16 2008 references that *"Francis DeLape owns fifty percent of Landbridge and fifteen percent of Six Diamond"* (Pillar Panama, S.A. v. DeLape et al See 4:2007cv01922 Filing 65)[1].

14.     Defendant, THINKEQUITY and is referred to on both its website and that of defendant, FORDHAM FINANCIAL MANAGEMENT, as a Division of said defendant, FORDHAM FINANCIAL MANAGEMENT.[2]

15.     Defendants, BOB SAGARINO, BRUCE INGLIS and PREMCHAND BEHARRY, are on the Board of Directors of the defendant, SIX DIAMONDS RESORTS INTERNATIONAL, INC.

**NATURE OF ACTION AND OVERVIEW**

16.     This is a federal class action on behalf of persons who purchased the securities of the Fordham Holdings Group, Inc., Fordham Financial Management Inc. and Six Diamonds Resorts International Inc., and who were scammed into provided certain bridge loans ostensibly collateralized by Panamanian land or were otherwise enticed to invest in a Panamanian version of a Florida swampland speculators scam. That this action is brought pursuant to the Racketeer Influenced and Corrupt Organizations Act as well as common law fraud and related causes of action.

17.     The complaint alleges that defendants' Class Period representations were materially false and misleading when made for the following reasons:

---

[1] https://cases.justia.com/federal/district-courts/texas/txsdce/4:2007cv01922/511209/65/0.pdf?ts=1289256980
[2] https://www.think-equity.com/

18.    Plaintiff alleges that from at least June 2006 through January 2017 (the "Class Period"), Defendants  made a series of fraudulent securities offerings and/or continuing false representations concerning those securities offerings involving series of cumulative dividend preferred stock that ultimately solely benefited Defendants' investment advisory and broker dealer businesses which served as a platform for other scams including the offering of "one off" debt instruments issued outside of any security regulations and also a common stock offering ostensibly backed by a Panamanian land development scam. Defendants' corporate entities made direct retail sales of securities, through placement subscription agreements for each offering, and sold the stock to retail investors like the Plaintiff.

19.    Defendants falsely promised cumulative dividends to be paid yearly which they misrepresented to investors would pay *"cumulative annual interest"* creating the impression that these series of preferred stock were a dependable species of secured debt, repeatedly misrepresenting the nature of this investment and as recently as 2019 falsely placating Plaintiff by leading him to believe he had a secured debt instrument with bankable interest owed.

20.    As to certain, multiple loans, Defendants falsely represented that such loans were collateralized and promised that they would eventually be paid. However, they have never been repaid. A subsequent promissory note expressly guaranteed certain lands as collateral. When the collateral was sold in recent years, none of the proceeds were used to reimburse said Plaintiff, and thus the fraud was uncovered.

21.    On information and belief the majority of funds raised through the offerings

that represented they would be used to purchase interests in real estate or development were not used for their stated purpose, and the proceeds from later offerings were used to pay expenses related to earlier offerings and returns to investors in those offerings.

22.     Defendants sold ostensibly safe securities such as serial preferred stock to a myriad of investors. But it was actually operating a Ponzi-like shell game in which assets were shuttled from one entity or offering to another and investors to the extent they received any returns were paid from whatever money was available, presumably that of the most recent investors.

23.     Defendants, WILLIAM BAQUET (hereinafter referred to as "Baquet") and FRANK M. DELAPE (hereinafter referred to as "Delape") were principally responsible for orchestrating the scheme, as well as defendants, FORDHAM HOLDINGS GROUP, INC. (hereinafter referred to as "FHG") and FORDHAM FINANCIAL MANAGEMENT, INC. (hereinafter referred to as "FFM), as broker-dealer and advisors, defendant, CHARLES GIORDANO (hereinafter referred to as "Giordano") as investment advisor, and the entities that offered and sold securities. Although each offering was made by a separate entity through a separate private placement it is alleged that the offerings in fact involved a single plan of financing and was organized to defraud innocent investors.

24.     Defendant, PHYLLIS HENDERSON (hereinafter referred to as "Henderson") FFM's Director of Compliance is named herein for falsely misrepresenting the nature of the securities sold and repeatedly placating investors with false information leading them to believe that they're investments were secure and collectible.

25.     Defendants, BOB SAGARINO (hereinafter referred to as "SAGARINO"),

BRUCE INGLIS (hereinafter referred to as "INGLIS"), and PREMCHAND BEHARRY (hereinafter referred to as "BEHARRY"), as Board members of defendant, SIX DIAMONDS RESORTS INTERNATIONAL, INC., were privy to an $8 million dollar appraisal for the Brenon Properties commissioned by DELAPE. This valuation was used as a lure to entice investment in the loans that were intended to be secured by the parcels. SAGARINO, INGLIS and BEHARRY with full knowledge of this history also approved a subsequent sale of the Brenon Property at BAQUET's direction at a fraction of this valuation. This sale effectively sold land intended to collateralize these loans out from under the lenders without recompense.

26.    Plaintiff alleges the defendants violated the antifraud provisions of the federal securities laws as well as common law fraud, conversion and breach of fiduciary duties and seeks disgorgement of ill-gotten gains plus prejudgment interest and financial penalties.

## STATEMENT OF FACTS

27.    In 2006 DR. BONGIORNO met GIORDANO at a soccer game. GIORDANO was and is an advisor at FFM. FFM is a registered broker-dealer and member of the National Association of Securities Dealers and a wholly owned subsidiary of FHG. GIORDANO entices DR. BONGIORNO about his firm, FFM, having a hot Initial Public Offering for a company, Isologen. Its CEO was DELAPE. DELAPE as well as GIORDANO and BAQUET, over time prove to be central to a systematic scheme to defraud DR. BONGIORNO of his lifesavings. BAQUET and DELAPE end up being principals of or beneficial owners of many of the entities used to facilitate the scheme to

defraud the Plaintiff and similarly situated investors.

28.     Isologen and DELAPE were later the subject of numerous federal lawsuits alleging securities fraud. In any case, GIORDANO becomes a financial advisor to DR. BONGIORNO with a fiduciary duty to place the Plaintiff's interest above his own and the other participants in the schemes and fraud alleged herein. DR. BONGIORNO purchased Isologen and actually secured a return on his investment before the stock collapsed and long before the sundry derivative actions and Class Action lawsuits alleging fraud and misrepresentation. This investment is the last time DR. BONGIORNO makes any money or receives any return on a stock investment with or in FHG, FFM, SIX DIAMONDS RESORT INTERNATIONAL, INC. (hereinafter referred to as "SDRI, INC."), DELAPE, GIORDANO and BAQUET. Again, DELAPE and BAQUET are the common denominator in a web of companies and entities used to defraud DR. BONGIORNO and other investors.

### (PANAMANIAN LAND SCHEME)

29.     In 2007, BAQUET and DELAPE opened a Panamanian shell company, LANDBRIDGE HOLDINGS INTERNATIONAL, S.A. (hereinafter referred to as "LBH") as a vehicle for land acquisition and ostensibly the first phase to developing high end resorts in Panama. Given that DR. BONGIORNO received a return on his investment in Isologen, DELAPE's involvement in this Panamanian project made it look like an attractive opportunity. For all intents and purposes, the Isologen "one-off", borrowing a page from *Stratton Oakmont's* playbook, functioned as a lure ensnaring DR. BONGIORNO into a multi-tiered systematic fraud which ultimately divested him of his life savings. Isologen, an alleged maker of anti-wrinkle products, filed for Chapter

10

11 Bankruptcy in June of 2009.

30.     DELAPE and BAQUET then opened another Panamanian holding company, the defendant, SIX DIAMONDS RESORT INTERNATIONAL, S.A. (hereinafter referred to as "SDRI, S.A.") for the stated purpose of developing and or holding some if not all of the LBH properties. A joint venture was formed between SDRI, INC. and LBH with SDRI, INC. incurring all expenses of LBH including taxes, title costs, maintenance, legal fees, and the like.

31.     Refreshing the well-worn play book of Floridian swampland confidence men and storied Florida land scams, BAQUET and DELAPE invited DR. BONGIORNO and others on an all-expense paid trip to Panama to pitch this shell investment opportunity.

32.     DR. BONGIORNO asked during a presentation if investments in SDRI, INC. was secured by the land held by LBH. BAQUET personally guaranteed the SDRI, INC. investments would be secured by the LBH land. With this added assurance, many of the investors present at the Marriott Hotel in Panama signed on.

33.     Kindred to a Florida land scam where the properties prove to be protected wetlands, many of the properties that LBH purchased in fact were a species of Panamanian land deemed Rights of Possession (hereinafter referred to as "ROP") parcels. These parcels present unique obstacles to financing, developing and construction and to rationalizing title. ROP's are not recorded with Panama's Public Registry as titled land deeds but must be recorded either with the Ministry of Agriculture Agrarian Reform offices or the Directorate General of the Surveyor in the

Ministry of Economy and Finance. Certain ROP lands are not recorded in any central recording system. None of the investors were advised of these obstacles before signing on. In fact, BAQUET assured them development was right around the proverbial "corner."

## (BRIDGE LOANS TO NOWHERE)

34.    Close in time to the purchase of the stock from an FFM run IPO in SDRI, INC., DR. BONGIORNO was asked by GIORDANO, DELAPE and BAQUET to provide what was inaccurately but purposefully described by BAQUET as a "bridge loan" of $50,000 to SDRI, INC. In keeping with this kind of scheme, DR. BONGIORNO was repaid the $50,000 shortly after providing this loan and almost simultaneously after repayment was bamboozled into providing yet another so called "bridge loan" of $100,000 by BAQUET and DELAPE, with additional assurances from GIORDANO, BAQUET and DELAPE that the investment was good and secured by the land. A bridge loan by definition requires some collateral or security and has a definite duration. Otherwise, the loan is an "unsecured loan."

35.    It is not uncommon in confidence schemes for the mark to receive money back from a first loan or a first investment. This is followed with subsequent *asks* shortly thereafter for a greater amount to be borrowed or invested because the mark has been lulled into a false sense of confidence that he will be repaid. The Confidence men effectively bank a reservoir of trust they can draw upon again and again by having made good on this first transaction.

36.    After the first "bridge loan" of $50,000, FFM issued the said IPO for shares

of stock in SDRI, INC. BAQUET, GIORDANO and DELAPE, convinced Dr. Bongiorno to purchase $500,000 worth of shares. GIORDANO, as DR. BONGIORNO's investment advisor, assured the Plaintiff it was a good and safe investment. Buoyed by his investment in Isologen and the said assurances, DR. BONGIORNO bought the stock shares. To date, this stock, for all intents and purposes, has been worthless.

37.     As described shortly after loaning the said $100,000, DR. BONGIORNO was then asked for another bridge loan of $100,000 by BAQUET and DELAPE, allegedly but falsely claimed to be secured by parcels in Panama dubbed the Brenon Properties.  GIORDANO and BAQUET reeled him in again with further assurances the development projects were moving forward with DELAPE in fact running the day to day process and BAQUET holding the purse strings.

38.  Incredibly, DR. BONGIORNO, despite the two previous loans for $100,000 and the investment of $500,000 in stocks, was again approached by BAQUET for an additional investment in the form of a promissory note to SDRI, INC. for $169,833. BAQUET and DELAPE had so far convinced DR. BONGIORNO to issue three (3) purposefully falsely described bridge loans to fund SDRI, INC's activities and he fell for it because the first loan of $50,000 was repaid so quickly. Immediately upon repayment Baquet requests another bridge loan of $100,000. Shortly thereafter, another bridge loan of $100,000 is asked for and granted by DR. BONGIORNO. When he requests repayment from time to time, the Plaintiff receives assurances payment would be made soon. Then in 2014, when another *ask* is made of him, DR.

BONGIORNO, who at this point is heavily invested in these land development projects, agrees to a promissory note in the amount of $169,833. Plaintiff is told by BAQUET with reassurance from GIORDANO this one is collateralized and guarantees payment for all the past issuance. In 2017, when Baquet and company sell the Brenon Property which was supposed to serve as collateral for these notes, DR. BONGIORNO is not repaid and the existence and extent of the schemes and fraud are becoming clear to him.

39.  Sale of the Brenon property occurred with no allocation of proceeds to DR. BONGIORNO as per his ownership rights and collateral rights. BAQUET orchestrated the sale and deprivation of the rights of DR. BONGIORNO with the knowledge and consent of the Board members of SDRI, INC., those being SAGARINO, INGLIS, and BEHARRY. There was a systemic scheme by all the foregoing to essential defraud DR. BONGIORNO of almost $400,000. Besides BAQUET's verbal assurances that this property would stand as collateral, there are writings referencing this fact. Conveyance of the Brenon property without remuneration to DR. BONGIORNO demonstrates fraud and refreshes the underlying debt instruments which are effectively interlinked and successively predicated upon one another. The belated unearthing of these fraudulent conveyances exposed the entire note scheme as yet another fraudulent scheme.

40.  Baquet as CEO of SDRI, INC., orchestrated sale of the Brenon property. DR. BONGIORNO is owed $369,833 plus interest from the sale of this land.

## (SERIAL LIES & PREFERRED STOCK)

41.    In June of 2008 DR. BONGIORNO was approached by BAQUET to invest in FHG with the purchase of 100,000 shares at $5 a share for Series BB cumulative preferred stock for a total investment of $500,000. DR. BONGIORNO purchased the entire series of BB. Shares carry a (7%-8%) cumulative dividend paid annually. The actual dividend % is in question due to conflicting documents supplied by FHG. As part of the deal, DR. BONGIORNO received 10% warrant coverage. It needs to be understood that FHG was a holding company whose sole viable asset was FFM.

42.    Before investing, DR. BONGIORNO consulted with his investment advisor, GIORDANO, as to whether this was a good investment. GIORDANO, a senior member of FFM, responds "*all previous investors are very happy with the investment in the past series of preferred stocks.*" GIORDANO withholds the fact that no dividends have ever been paid to these "happy" investors.

43.    Previously FHG issued Series A preferred stock of 1 share to BAQUET. FHG then issued Series B preferred stock with no dividends attached. This was followed by issuance of Series C preferred stock. Oddly FHG then appears to jump to issuing series E, F, G, H, and AA. Series C to AA all had cumulative preferred dividends payable with different % rates.

44.    In June of 2008 FHG issued the Series BB Preferred stock with FFM acting as broker which, as referenced above, DR. BONGIORNO purchased and in December 2008 Series CC Preferred stock which Plaintiff also was convinced to purchase by BAQUET with the advice of GIORDANO. DR. BONGIORNO

purchased 20,000 shares of this Series CC Preferred stock at $5 per share for an investment of an additional $100,000.

45.   These shares also facially purport to carry an annual cumulative dividend and 2% warrant coverage. FHG then issued its last series of preferred stock with its series DD issuance which also features a cumulative annual dividend.

46.   FHG's instruments indicate the funds secured from sale of preferred stock series were used to: *Recruit brokers to FFM, Retire previous preferred stock issues, Operating Capital.*

47.   Upon information and belief regulators prevented FHG from issuing any further series of preferred stock offerings representing a cumulative preferred dividend to be paid to investors. Something stinks in Denmark when a company that has issued nine (9) series of cumulative preferred stocks and has purportedly never paid out one dollar to investors in the form of a dividend while continuing to market and sell these securities based on the promise of these dividends.

48.   Despite rumblings DR. BONGIORNO is lulled into a false sense of security by assurances provided by GIORDANO who continued to act as Plaintiff's financial advisor, and by BAQUET worked tirelessly to reassure DR. BONGIORNO of the value of his investments and that he was now his "good" friend. One of the features of the preferred series that seems to have placated DR. BONGIORNO is that the Series BB and CC issues gave the Plaintiff the right to warrants issued from future deals FHG participated in. FHG was entitled to 100% of warrants issued with Dr. Bongiorno having a contractual right to 12% of FHG's 100%.

49.   Since DR. BONGIORNO's initial purchase of FHG Preferred Stock through FFM as broker with annual cumulative dividends attached to them to fund broker acquisition, retire past preferred issues and supply FFM and FHG with operating capital there, is no proof that FHG or FFM has ever paid any cumulative dividends. The issuance of 9 series of these types of deals without any dividends paid to any investors is a solid indication that FHG and FFM never had an intention to pay any dividends whatsoever on these issues.

50.   Regulators are believed to have contacted FGH and FFM and issued a stop order in the issuance of any more of these types of preferred offerings since the lack of any dividends ever being paid make the promise of payout of an annual cumulative dividend misleading on its face.

51.   BAQUET, FHG and FFM were all behind the issuance of these deals. In June 2008 at the prodding of GIORDANO and BAQUET, and especially on the advice of GIORDANO, Plaintiff purchases the entire Series BB Cumulative Preferred Stock for $500,000. In December 2008, GIORDANO and BAQUET again, after much prodding, and with the advice of GIORDANO, get DR. BONGIORNO to purchase $100,000 worth of the Series CC Cumulative Preferred Stock.

52.   Defendant, HENDERSON, Chief Compliance officer of FFM, upon requests for updates and the status of his investment from DR. BONGIORNO repeatedly, inaccurately and with intended deceit, refers in writing to these "dividend" payments as simple "interest" payments earned.  This fraudulent misrepresentation leads Dr. Bongiorno to think of these "dividends" as "interest" payments and consequently like

bonds, earned interest payable to investors that must be paid. These writings go out under BAQUET's reign as CEO of FFM. This is more than just a little bit misleading and use of this nomenclature was intended to placate DR. BONGIORNO to make him believe he actually has an iron clad secure investment kindred to a secured debt to prevent him from filing a complaint with regulators or filing suit before any statute of limitations might elapse. Defendant, HENDERSON acted on the direct orders of BAQUET in deceiving DR. BONGIORNO and other investors who made inquiries with the assurance of payment to the Plaintiff to be made by march of 2020 (to which no such payment has ever been made, and upon information and belief, assets that remain in many of the entities described herein are quickly being transferred, sold and/or dumped).

53.    The material misrepresentations are indicative of a conscious effort to conceal the true nature of the investment and FFM's actual intent to defraud its investors.

54.    The proceeds from DR. BONGIORNO's Preferred Series BB and CC share purchases, according to documents received from HENDERSON as Chief Compliance Officer were to be used for the recruitment of brokers, retirement of previous preferred stock issues and for operational expenses for FFM.

55.    On information and belief given this elaborate shell game not all the monies were used as promised. It is not known whether the preferred series A, B, C, E, F, G, H, AA, and DD investors were paid off. The series BB and CC investors were not since the Plaintiff has received no money from the retirement of his shares. On

information and belief no cumulative dividends (or as HENDERSON refers to them as interest earned) paid off on series A, B, C, E, F, G, H, AA, and DD. The restrictive nature of the issuances purchased by DR. BONGIORNO contractually prevent him from selling the shares to mitigate his losses.

56.   This course of conduct was completed under BAQUET's leadership. HENDERSON's characterization of these transactions served to disguise the true nature of these investment vehicles. Exchanges also confirm there were shortcuts at inception that do not comport with SEC requirements (i.e. no dissemination of PPM before investment by DR. BONGIORNO).

### (SIX DIAMONDS ROPE A DOPE)

57.   DR. BONGIORNO is informed by GIORDANO that the delay in development of the Panama properties is due to DELAPE squandering approximately $12,000,000.00 in SDRI, INC. capital. GIORDANO, have being a link to plaintiff being roped in to the investments described herein, now concedes that his investment in SDRI, INC. was very much at risk and not likely to be recouped unless there was a change in direction and a change in management. This was first step in a scheme by BAQUET, GIORDANO and DELAPE to cover for the missing investment capital. BAQUET takes over on the second step and manipulates DR. BONGIORNO to come on board and help streamline the management of the development project and right the ship. He stroked DR. BONGIORNO's ego, convincing him that his building of a successful Chiropractic practice and the profitable management of a Medical Arts facility made him more than qualified to lead the effort to develop these properties in

a foreign country. DR. BONGIORNO, who already has his life savings invested in the Panama projects, agrees to become CEO of SDRI. It was never explained nor was DR. BONGIORNO given any documentation prior to taking over as CEO, where the $12,000,000.00 went, and more importantly, who financially benefited from same. However, he was given no control over what really matters: the purse strings. That power remained solely and tightly in the hands of BAQUET. DR. BONGIORNO works tirelessly for no salary. Initially his sole remuneration was investing an additional $250,000 for 5% of LBH and 3 million shares of SDRI, INC. -- supposedly discounted from market value but which in fact are worthless. LBH is the land holding company but DR. BONGIORNO has no say in how, when or why the land can be developed, abandoned or sold. Dissatisfied with progress made on development of the land, eventually Dr. Bongiorno by BAQUET and the Board members, SAGARINO, INGLIS and BEHARRY, is enticed to stay with the grant of a small monthly stipend and an additional 5% interest in LBH. DR. BONGIORNO was assured by BAQUET that receiving the total of 10% in LBH meant he owned 10% of the land held by this company. This, of course, was a fraudulent representation.

58.   DR. BONGIORNO attempted to reorganize the project and reduce costs as well as worked resolving ROP issues that previously proved an impediment to development and conventional financing. Financing, raising capital and/or stock issues were not a part of his responsibility. These were handled by BAQUET and FFM. Rationalizing title to a goodly portion of the land portfolio's title theoretically should have put SDRI, INC. back in the black.

59.  In the Fall of 2015, Plaintiff started to suspect that Baquet was torpedoing for alleged financial or stylistic reasons credible prospective blue-chip type resort and hotel partners that he (DR. BONGIORNO) had brought in. Ultimately exasperated at this impasse, Plaintiff tendered his resignation from SDRI, INC. in 2015.

60.  As an outgrowth of his tenure as CEO of SDRI, INC., DR. BONGIORNO was made to believe by the defendants, BAQUET, GIORDANO, SAGARINO, INGLIS and BEHARRY, that he owned a 10% interest in the Panama land with BAQUET owning 45% and SDRI, INC. owning the remaining 45%. SDRI, INC. itself is owned by other shareholders. Obviously, this interest in land is highly illiquid and the values of the SDRI, INC. stock itself depressed by the failure to develop the properties and the sheer volume of shares that have been sold.

## (THE WARRANT SCAM)

61.  FFM entered into an Office of Supervisory Agreement (hereinafter referred to as "OSA") with the defendant, THINKEQUITY in or about 2018 which is listed as a division of FFM.  As part of the deal between THINKEQUITY and FFM, 80% of FHG's warranty rights in any new deals FHG is involved in were transferred to THINKEQUITY. The net result is a severe dilution of Plaintiff's warrant rights in future deals. Undertaking such a self-serving action without any recompense to DR. BONGIORNO is yet another indication of something kindred to systemic shareholder oppression or defrauding investors of an expectancy interest.

## (BEFORE THE THINK EQUITY DEAL)

62.   If a deal, for example, results in 100,000 warrants being issued as compensation to FFM, FHG would be entitled to 100% of these warrants. DR. BONGIORNO, in turn, is entitled to 12% of FHG's warrants or 12,000 warrants from the deal.

## (AFTER THE THINK EQUITY DEAL)

63.   If a new deal results in 100,000 warrants issued, then THINKEQUITY receives 80,000 warrants by reason of its agreement with FHG. FHG then would receive 20,000 warrants. DR. BONGIORNO, as he is entitled to 12% of FHG's warrants, now only gets 2,400 warrants. To state the obvious, this is substantially less than what he was guaranteed.

64.   Plaintiff is entitled to 12% of FHG's 100% warrants on all future deals after the issuance of the Series BB and CC cumulative preferred stock deals. This was unilaterally diluted by FHG with its OSA with THINKEQUITY and using 80% of FGH's warrant allocation to consummate its deal with THINKEQUITY resulting in a reduction of DR. BONGIORNO's distribution of his share of FHG's warrant allocations. Baquet is involved in the transaction as CEO of FFM and FHG.

65.   Since Think Equity is a division of FFM and FHG owns FFM, FHG receives a decreased benefit of warrants due to a sham transaction that effectuates a defrauding of DR. BONGIORNO.

## (COMMON SCHEME TO DEFRAUD)

66.   As a matter of public record, BAQUET is the CEO of FFM. He also serves

22

in an advisory role. He and his company have received numerous regulatory fines, sanctions and censures from regulators. These include in 2012 BAQUET being sanctioned for failing as CEO to sign CEO certifications certifying written compliance policies and written supervisory procedures for years spanning 2008 and 2009. These are the years Plaintiff was bamboozled into transacting large Preferred stock trades and enticed into this systematic multi-tier fraudulent scheme.

### (THE TRUTH BEGINS TO EMERGE)

67.    The pattern of events that enticed DR. BONGIORNO and ultimately led to him being defrauded of his life savings ultimately led to Plaintiff coming to the realization he had been defrauded.

68.    Dr. Bongiorno worked avidly to resolve ROP title issues and then identified credible blue-chip deal partners to make a premium resort a reality. When Baquet nixed the second of these prospective deals on what looked like pretextual grounds, DR. BONGIORNO became worried. One blue-chip resort provided a commitment which was negotiated by DR. BONGIORNO after his resignation from SDRI, INC. on December 1, 2015. Then, in 2017 when BAQUET sold the Brenon Property which was the collateral to promissory note and the proceeds from which DR. BONGIORNO was promised by the Board members sued herein and BAQUET would be used to pay off the two outstanding notes as well, no payment to plaintiff was ever made. DR. BONGIORNO realized he was the victim of an elaborate scheme to defraud him. He had been led down the "garden path" and demanded payments on his notes and the promised "interest payments" on his preferred stock.

The plaintiff was given the run around, received false assurances from GIRDANO that BAQUET would make good and strung him along. Now we learn, upon information and belief, that the defendants have conspired to "dump" assets in a shell game to insulate themselves and their personal interests from investors. Upon reviewing available documents and correspondence and running up against recalcitrant defendants unwilling to resolve this matter both before and after counsel's intervention, this suit has been filed.

## SUBSTANTIVE ALLEGATIONS

### Additional Background

69. This is an action for Racketeer Influenced and Corrupt Organizations Act of 1970 ("Rico") (Title 18 USC §§ 1961) Re: Multiple Rico Primary Secondary, Derivative, and Conspiracy Liability Re: Pinkerton, v. United States, 328 U.S. 640 (1964); Rico Conspiracy to Aid and Abet; and, Rico Aiding and Abetting Rico Conspiracy Re: For Primary Contravention of Rico § 1962 (Title 18 U.S.C. §1962); for Rico Aiding and Abetting Primary Contravention of Rico §1962) (Title 18 U.S.C. § 1962); for Rico Respondent Superior/Derivative Liability Arising from Primary Contravention of Rico §1962) (Title 18 U.S.C. § 1962)); for Rico § 1962(d) Conspiracy Arising from Primary Rico§1962) Contravention (Title 18 U.S.C. §§1962(c)-(d)); for Rico §1962(d) Conspiracy Arising from Aiding and Abetting Rico §1962) Primary Contravention (Title 18 U.S.C. §§1962(c)-(d)); for Rico §1962) Aiding and Abetting Rico §1962(d) Conspiracy to Contravene Rico § 1962) (Title 18 U.S.C. §§1962 (c)-(d)); for Primary Contravention Rico §1962(b) (Title 18 U.S.C. §1962(b)); for Rico Aiding and Abetting Primary Contravention

24

of Rico §1962(b) (Title 18 U.S.C. §1962(b)); for Rico Aiding and Abetting Primary Contravention of Rico §1962(b) (Title 18 U.S.C. §1962(b)); for Rico Respondeat Superior/Derivative Liability Arising from Primary Contravention of Rico §1962(b) (Title 18 U.S.C. §1962(b)); for Rico § 1962(d) Conspiracy Arising from Primary Rico §1962(b) Contravention (Title 18 U.S.C. §§1962(b)-(d for Rico §1962(d) Conspiracy Arising from Aiding and Abetting Rico §1962(b) Primary Contravention (Title 18 U.S.C. §§ 1962(b)-(d)); for Rico § 1962(b) Aiding and Abetting Rico §1962(d) Conspiracy to Contravene Rico §1962(b) (Title 18 U.S.C. §§1962(b)-(d)); for Primary Contravention Rico §1962(a) (Title 18 U.S.C.§ 1962(a)); For Rico Aiding and Abetting Primary Contravention of Rico § 1962(a) (Title 18 U.S.C. §1962(a)); for Rico Respondeat Superior/Derivative Liability Arising from Primary Contravention of Rico § 1962(a) (Title 18 U.S.C. § 1962(a)) for Rico §1962(d) Conspiracy Arising from Primary Rico §1962(a) Contravention (Title 18 U.S.C. §§1962(a)-(d)); for Rico §1962(d) Conspiracy Arising from Aiding and abetting Rico §1962(a) (Title 18 U.S.C. § §1962(b)-(d)); for Rico §1962(a) Aiding and Abetting Rico §1962(d) Conspiracy to Contravene Rico §1962(b) (Title 18 U.S.C. §§1962(a)-(d)); for Rico §1962(d) Conspiracy Re: Conspiracy to Conceal Rico §1962(b) Contravention (Title 18 U.S.C. § §1962(b)-(d)); for Rico §1962(d) Conspiracy Re: Conspiracy to Conceal Rico §1962(a) Contravention (Title 18 U.S.C. § §1962(a)-(d)); for Rico §1962(d) Conspiracy Re: Inter-Corporate Affiliate Conspiracy Rico §1962 Contravention (Title 18 U.S.C. §§1962(a)-(d)); for Immediate Dissolution of Rico Enterprise and Permanent Expulsion of Rico Persons from Rico Enterprise Pursuant to Rico §1964(a)-(b) (Title U.S.C. §1964(a)-)b)) of the Racketeer Influenced And Corrupt Organizations Act of 1970

25

("Rico"); For Immediate Dissolution of Rico Enterprise and Permanent Expulsion of Rico Persons from Rico Enterprise Pursuant to Rico § 1964(b) (Title U.S.C. §1964(b)) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("Rico") and Rule 65 of the Federal Rules of Civil Procedure; for Immediate Dissolutions of Rico Enterprise and Permanent Expulsion of Rico Persons from Rico Persons from Rico Enterprise Pursuant to Rico 1964(a) (Title U.S.C. §1964(a)) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("Rico") and Rule 64 of the Federal Rules of Civil Procedure; for Immediate Dissolution of Rico Enterprise and Permanent Expulsion of Rico Persons from Rico Enterprise Pursuant to Rico §1964(b) (Title U.S.C. § 1964(b)) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("Rico"); for Immediate Dissolution of Rico Enterprise and Permanent Expulsion of Rico Persons from Rico Enterprise Pursuant to Rico § 1964(b) (Title 18 U.S.C. §1964(b)) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("Rico") and Rule 65 of the Federal Rules of Civil Procedure; For Ex Parte Issuance of Preliminary and Permanent Injunctive Relief Pursuant to FRCP 65 and Rico § 1964(a) for Ex Parte Issuance of Preliminary and Permanent Injunctive Relief Pursuant to FRCP 64 and Rico § 1964(a); for Ex Parte Temporary Restraining Order Relief re: Enjoin Pending Litigation Pursuant to Rico § 1964(a) (Title 18 U.S.C. § 1964(a)) of the Racketeer Influenced and Corrupt Organizations Act or 1970 ("Rico") and Rule 65 of the Federal Rules of Civil Procedure; for Ex Parte Temporary Restraining Order Relief re: Enjoin Pending Litigation Pursuant to Rico §1964(b) (Title 18 U.S.C.§1964(b)) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("Rico") and Rule 65 of the Federal Rules of Civil Procedure; for Rico §1962(d) (Title 18 U.S.C. § 1962(d))

Conspiratorial Liability for Contravention of Rico § 1962) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("Rico") (Title 18 U.S.C. §1962) Pinkerton Doctrine (Pinkerton V. United States, 328 U.S. 640 (1946)) re: Conspiracy to Conceal; for Rico § 1962(d) (Title 18 U.S.C. §1962(d)) Conspiratorial Liability for Contravention of Rico §1962(a) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("Rico") (Title 18 U.S.C. §1962(a)) Pinkerton Doctrine (Pinkerton V. United States, 328 U.S 640 (1946)) re: Conspiracy to Conceal; for Aiding and Abetting Rico Conspiracy Rico Section 1962(d) (Title 18 U.S.C.§1962(d)) Conspiratorial Liability for Contravention of Rico § 1962) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("Rico") (Title 18 U.S.C. §1962)) Pinkerton Doctrine (Pinkerton V. United States, 328 U.S. 640 (1946)); for Aiding and Abetting Rico Conspiracy Rico Section 1962(d) (Title 18 U.S.C. §1962(d) Conspiratorial Liability for Contravention of Rico § 1962(a) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("Rico") (Title 18 U.S.C. §1962(a)) (Pinkerton V. United States, 328 U.S. 640 (1946)); for Rico Conspiracy for Rico Aiding and Abetting re: Primary Rico Section 1962) re: Rico Section 1962(d) (Title 18 U.S.C. §1962(d)) Conspiratorial Liability for Contravention of Rico § 1962) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("Rico) (Title 18 U.S.C. §1962)) Pinkerton Doctrine (Pinkerton V. United States, 328 U.S. 640 (1946)); for Rico Conspiracy for Rico Aiding and Abetting re: Primary Rico Section 1962(b) re: Rico Section 1962(d) Rico Conspiracy Rico Section 1962(d) (Title 18 U.S.C. §1962(d)) Conspiratorial Liability; for Rico Conspiracy for Rico Aiding and Abetting re: Primary Rico Section 1962(a) re: Rico Section 1962(d) Rico Conspiracy Rico Section 1962(d) (Title 18 U.S.C. §1962(d))

27

Conspiratorial Liability for Contravention of Rico § 1962 (a) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("Rico") (Title 18 U.S.C. §1962(a)) Pinkerton Doctrine (Pinkerton V. United States, 328 U.S. 640 (1946)); for Rico Successorship Liability re: Rico §§ 1962 (a), 1962 (B), 1962), 1962(d), 1964(a), and 1964(b)); for Federal Declaratory Relief Pursuant to the  Federal Declaratory Judgment Act of 1940 (Title 28 U.S.C. §§ 2201-2202); for Commission of Common Law Fraud re: Constructive Fraud and re: Promissory Fraud; for Commission of Civil Conspiracy to Commit Common Law Fraud re: Constructive Fraud and re: Promissory Fraud; for Commission of Common Law Conversion; for Commission of Civil Conspiracy to Commit Common Law Conversion; for Commission of Money Had and Received; for Unjust Enrichment; for Negligent Misrepresentation; for Entry of Appropriate Order Commanding Immediate Accounting of Monies and Properties Pursuant to (Title 18 USC §§ 1962(a) -d), 1964(a), and 1964(b)); for Disregard of Corporate Entity Re: Piercing Corporate Entity as Mere Subterfuge-Shell-Sham and Absence of Independent Legal Significance re: Alter Ego Liability as well as collection of a rents and transfer of funds to Banks in the State of New York. The total amount due and owing as of $5.2 million is due and owing plus punitive damages and attorneys' fees.

70.    In the course of investigating the circumstances surrounding the conveyance of certain properties held out to be collateral for loans made by Plaintiff, Individual Plaintiff researched title and took other investigative steps and Individual Plaintiff has discovered instances of fraud in the inducement, conspiracy to commit fraud, tortious interference with contract and breach of fiduciary responsibilities to shareholders,

conversion, malfeasance and misfeasance and multiple instances of breach of Federal and States law that taken together demonstrate a criminal conspiracy and criminal enterprise between and among the Defendants.

71.     Ultimately, Individual Plaintiff learned that Individual Defendants DELAPE and BAQUET (with knowledge of the defendants, HENDERSON, SAGARINO, INGLIS and BEHARRY, to varying degrees), had masterminded a scheme to defraud clients like the Plaintiff in a "Note Scheme" a Preferred Stock scheme, a Panamanian Land Development scheme including. Instead of actively marketing pursuing a land redevelopment strategy for certain properties, Individual Defendants went through the motions of seeking to develop these properties whilst continuing to raise capital which was presumably not spent as promised.

72.     Among the many entities drawn into Defendants' schemes on information and belief include Brenon Investments, S.A., Punta Bocas, S.A., Blue Diamond Investments, S.A., Port City Investments, S.A., Iversiones Akave, S.A., Poodle Posse Group, S.A., Tres Cruces De Oro, S.A., Semper Fideles Development, North Pole International, S.A. and *Bob Sagarino, Bruce Inglis and Premchand Beharry*.

## RICO

### II. RICO PERSONS [RICO TITLE 18 UNITED STATES CODE § 1961(3)]

73.     Plaintiff alleges that: WILLIAM BAQUET, FRANK M. DELAPE, CHARLES GIORDANO and PHYLLIS HENDERSON individually and in their respective corporate capacities, FORDHAM FINANCIAL MANAGEMENT. INC, FORDHAM HOLDINGS GROUP INC., SIX DIAMONDS RESORTS INTERNATIONAL INC., SIX

DIAMONDS RESORTS INTERNATIONAL S.A., LANDBRIDGE HOLDINGS INTERNATIONAL S.A. THINK EQUITY (and as corporate entities where applicable) as well as BOB SAGARINO, BRUCE INGLIS and PREMCHAND BEHARRY, individually and in their capacity as owners and Board Members of SDRI, INC., are each engaged in activities and conduct that affect federal interstate and/or foreign commerce, that each hold legal, equitable, and/or beneficial interests in property, and each is a "person," as that term is defined pursuant to Section 1961(3) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"].

74.    Plaintiff alleges that each and every RICO person that is specifically identified and named as a RICO defendant is liable as a principal pursuant to Title 18 United States Code §§ 2(a)-(b) and that each and every RICO person that is a RICO defendant is liable as a co-conspirator pursuant to Title 18 United States Code § 371.

75.    Plaintiff alleges that at all times material herein, the activities, conduct, and/or omissions committed and/or engaged in by the defendants herein give rise to this action being instituted within this federal district court inasmuch as plaintiff is a citizen and resident, and defendant/s maintain principal place of business within, the City of New York, County of New York, State of New York, and the events that give rise to the federal Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"][Title 18 United States Code § §§ 1961, 1964(C)), 1965(a), (b), and (d)] action are predicated under the RICO co-conspiracy theory of venue and under the RICO co-conspiracy theory of personal jurisdiction, by and through employment of federal instrumentalities of federal interstate commerce, including the federal mails, federal wires, and traveling in connection with the

commission of racketeering activity across federal interstate and/or international boundaries and/or lines.

76.     Plaintiff further alleges that the defendants, each of whom are engaged in principal business activities within the County Of New York, State of New York, engaged in continuous, concerted, and systematic activities with plaintiff within this federal district, resulting in injury to their respective interests in their business or property, pursuant to RICO Title 18 United States Code § 1964(C)).

77.     Plaintiff alleges that venue is proper within this judicial district pursuant to Title 28 United States Code §§ 1391(a)(2), (a)(3), and (b) inasmuch as all defendants transact business and can be found within this district, and that a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject matter is situated within, this district.

78.     Plaintiff alleges that the nature of the controversy arising between the RICO plaintiffs and the RICO defendants is a controversy between parties completely diverse in federal citizenship; in as much as plaintiff is a citizen of the State of Florida, and defendants are citizens of the states of New York and Texas. Notwithstanding same Defendant, BAQUET and GIORDANO are licensed or registered as Investment advisors, and with the defendant, DELAPE, have companies with foreign registration doing business in New York and do business in New York and as such Plaintiff has brought the instant matter in New York. This will not burden Defendants in any ways as said Individual defendants, BAQUET, DELAPE, GIORDANO, as well as SAGARINO, INGLIS and BEHARRY, have substantial contacts, and financial and business interests in NY. Defendants,

31

HENDERSON and BAQUET, are known to be residents of the State of New York.

79.     Still Plaintiff alleges that the amount in controversy exceeds $75,000.00,

exclusive of costs, expenses, interests, and fees, for purposes of invoking and establishing

federal diversity of citizenship subject matter jurisdiction pursuant to Title 28 United States

Code §§ 1332(a)(1) which if need be will allow this matter to remain in the Southern

District of New York.

**FIRST CLAIM FOR RELIEF**
**MULTI COMPLEX RICO ARTIFICE AND SCHEME TO DEFRAUD [TITLE 18**
**U.S.C. § 1964(C))] re: DESTRUCTION and INJURY TO BUSINESS AND**
**PROPERTY INTERESTS - INTERNATIONAL MONEY LAUNDERING and**
**OBTAINING MONIES BY AND THROUGH FALSE PRETENSE, FRAUD,**
**THEFT, and CONVERSION**

80.     Plaintiff alleges that the afore described factual allegations establish the

commission of two or more forms of "predicate acts," "predicate offenses," and/or

"racketeering activity," as defined pursuant to Title 18 United States Code § 1961(1)(B) of

the federal Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"] [Title

18 U.S.C. §§ 1961-1968], committed by defendants. Plaintiff allege that the commission of

two or more forms of "predicate acts," "predicate offenses," and/or "racketeering activity"

committed by defendants contravened the following federal statutory provisions:

A. Federal Principal and Aider and Abettor Liability: Title 18 U.S.C.A. §2(a)-(b).

B. Federal Principal and Aider and Abettor Liability re: Aiding and Abetting A

Conspiracy: Title 18 U.S.C.A. §2(a)-(b).

C. Federal Principal and Aider and Abettor Liability re: Conspiracy to Commit Aiding and

Abetting: Title 18 U.S.C.A. §2(a)-(b)

D. Federal Mail Fraud: Title 18 U.S.C.A. §341.

E. Federal Mail Fraud re: Aiding and Abetting: Title 18 U.S.C.A. §1341.

F. Federal Mail Fraud re: Conspiracy: Title 18 U.S.C.A. §1341.

G. Federal Mail Fraud re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1341.

H. Federal Mail Fraud re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1341.

I. Federal Wire Fraud: Title 18 U.S.C.A. §1343.

J. Federal Wire Fraud re: Aiding and Abetting: Title 18 U.S.C.A. §1343.

K. Federal Wire Fraud re: Conspiracy: Title 18 U.S.C.A. §1343

L. Federal Wire Fraud re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1343.

M. Federal Wire Fraud re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1343.

N. Federal Intangible Personal Property Right Deprivation: Title 18 U.S.C.A. §1346.

O. Federal Racketeering: Title 18 U.S.C.A. §1952.

P. Federal Racketeering re: Aiding and Abetting: Title 18 U.S.C.A. §1952.

Q. Federal Racketeering re: Conspiracy: Title 18 U.S.C.A. §1952.

R. Federal Racketeering re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1952.

S. Federal Racketeering re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1952.

T. Federal Money Laundering: Title 18 U.S.C.A. §1956.

U. Federal Money Laundering re: Aiding and Abetting: Title 18 U.S.C.A. §1956.

V. Federal Money Laundering re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1956.

W. Federal Money Laundering re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1956

33

X. Federal Money Laundering re: Conspiracy: Title 18 U.S.C.A. §1956(h).

Y. Federal Money Laundering re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1956(h).

Z. Federal Money Laundering re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1956(h).

AA. Federal Criminally Derived Property: Title 18 U.S.C.A. § 1957.

BB. Federal Criminally Derived Property re: Aiding and Abetting: Title 18 U.S.C.A. § 1957.

CC. Federal Criminally Derived Property re: Conspiracy: Title 18 U.S.C.A. § 1957.

DD. Federal Criminally Derived Property re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1957.

EE. Federal Criminally Derived Property re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1957.

FF. Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion: Title 18 U.S.C.A. §2314.

GG. Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Aiding and Abetting: Title 18 U.S.C.A. §2314.

HH. Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy: Title 18 U.S.C.A. §2314.

II. Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §2314.

JJ. Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §2314.

KK. Federal Interstate Receipt of Transported Property Obtained By Fraud, False Pretense, and Conversion: Title 18 U.S.C.A. §2315.

LL. Federal Interstate Receipt of Transported Property Obtained By Fraud, False Pretense, and Conversion re: Aiding and Abetting: Title 18 U.S.C.A. §2315.

MM. Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy: Title 18 U.S.C.A. §2315.

NN. Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §2315.

OO. Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §2315.

81.    Plaintiff alleges that based upon the afore-referenced allegations against defendants: operate, manage, administer, control, direct, and/or own, directly or indirectly, affiliated party multi-tiered owned and operated corporate/partnership/business successor entities, and that such successor entities are potentially liable as RICO successors in interest for injuries sustained by plaintiff by reason of contravention of RICO Sections 1962(a)-(d), according to offer of proof at time of trial.

## IV. RICO § 1961(4) ENTERPRISE ALLEGATIONS re: RICO § 1962(C) CLAIM FOR RELIEF RE: [18 U.S.C. § 1961(4)]

82.    Plaintiff alleges that RICO Defendants, BAQUET, DELAPE, HENDERSON and GIORDANO, and SAGARINO, INGLIS and BEHARRY(Individually and in the capacity as Directors), and Corporate defendants (and as corporate entities where applicable), and other persons unknown to plaintiff, were employed by and associated with

35

others, and engaged in conduct that constitutes a RICO pattern of racketeering activity. Plaintiff further alleges that said RICO defendants were knowledgeable and aware of the activities of the following RICO §1961(4) enterprises, and that said RICO defendants facilitated and furthered the RICO §1962(d) conspiracies alleged herein, for the purpose and objective of damaging and/or injuring plaintiffs' interests in their businesses and/or properties.

83.     Plaintiff alleges that each of the following configurations, for purposes of plaintiffs' RICO §1962(C)) claims for relief, constitute a RICO "enterprise," as that term is defined pursuant to Title 18 United States Code §1961(4) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"][Title 18 U.S.C. §1961(4)] and within the strictures of Odom v. Microsoft Corp., 486 F.3d 541 (9th Cir. 2007)(en banc):

**A. RICO Enterprise No. 1**: Defendants, BAQUET, DELAPE, HENDERSON and GIORDANO, and SAGARINO, INGLIS and BEHARRY(Individually and in the capacity as Directors), and Corporate defendants (and as corporate entities where applicable), constitute a RICO enterprise, organized and maintained by and through a consensual hierarchy of partners, managers, directors, officers, supervisors, agents, deputies, and/or representatives that formulate and implement policies relative to the use of Defendants, BAQUET and DELAPE, and that said Individual defendants, BAQUET, DELAPE, GIORODANO, and HENDERSON as well as SAGARINO, INGLIS and BEHARRY in order to avoid the strictures of US law including but not limited to FCPA to secure valuable rights and benefits for Defendants and its principles and through solicitation, employing federal mails and/or federal interstate wires, as well as and providing documentary

36

materials describing mechanical procedures pertaining to the placement of monetary funds derived from improper solicitations or filings or other subterfuges has sequestered fund abroad to avoid the reach of Federal authorities. Plaintiffs allege that RICO persons, and other persons unknown to plaintiffs, acting in concert therewith, are employed by and associated with said RICO enterprise that is engaged in, or activities of which affect, federal interstate and/or foreign commerce, and that said RICO persons, and persons acting in concert therewith, conduct or participate, directly or indirectly, in the conduct of such RICO enterprise's affairs through a RICO pattern of racketeering activity.

**B. RICO Enterprise No. 2**: Defendants, BAQUET, DELAPE, HENDERSON and GIORDANO, and SAGARINO, INGLIS and BEHARRY(Individually and in the capacity as Directors), and Corporate defendants (and as corporate entities where applicable), constitute a RICO enterprise, organized and maintained by and through a consensual hierarchy of partners, managers, directors, officers, supervisors, agents, deputies, and/or representatives that formulate and implement plans to defraud or convert corporate resources for personal use up to and including defrauding or improperly influencing the State Department and/or other authorities to secure improper ends including but not limited to the defendant, BAQUET and DELAPE, maintaining dual citizenship with the US and Panama and/or the Cayman Islands to avoid tax liabilities and shelter ill-gotten income and to defraud Plaintiff and others by use artifices and devices both domestically and internationally, including, but not restricted to, the raising of monetary funds by and through solicitation, employing federal mails and/or federal interstate wires, as well as and providing documentary materials describing mechanical procedures pertaining to the

placement of monetary funds derived from solicitations in manners disallowed by law including the bribing of foreign officials or defrauding domestic banks or misusing otherwise valid corporate instruments and entities without authority. Plaintiffs allege that RICO persons, and other persons unknown to plaintiff, acting in concert therewith, are employed by and associated with said RICO enterprise that is engaged in, or activities of which affect, federal interstate and/or foreign commerce, and that said RICO persons, and persons acting in concert therewith, conduct or participate, directly or indirectly, in the conduct of such RICO enterprise's affairs through a RICO pattern of racketeering activity.

C. **RICO Enterprise No. 3**: Defendants, BAQUET, DELAPE, HENDERSON and GIORDANO, and SAGARINO, INGLIS and BEHARRY(Individually and in the capacity as Directors), and Corporate defendants (and as corporate entities where applicable), constitute a RICO enterprise, organized and maintained by and through a consensual hierarchy of partners, managers, directors, officers, supervisors, agents, deputies, and/or representatives funneling of illicit monies from illicit activities, employing federal mails and/or federal interstate wires, as well as and providing documentary materials describing mechanical procedures pertaining to the placement of monetary funds derived from such illicit activities. Plaintiff alleges that RICO persons, and other persons unknown to plaintiffs, acting in concert therewith, are employed by and associated with said RICO enterprise that is engaged in, or activities of which affect, federal interstate and/or foreign commerce, and that said RICO persons, and persons acting in concert therewith, conduct or participate, directly or indirectly, in the conduct of such RICO enterprise's affairs through a RICO pattern of racketeering activity.

38

**D. RICO Enterprise No. 4**: Defendants, BAQUET, DELAPE, HENDERSON and GIORDANO, and SAGARINO, INGLIS and BEHARRY(Individually and in the capacity as Directors), and Corporate defendants (and as corporate entities where applicable), constitute a RICO enterprise, organized and maintained by and through a consensual hierarchy of partners, managers, directors, officers, supervisors, agents, deputies, and/or representatives that involved themselves directly or indirectly in the falsification of banking and real estate documents and corporate resolutions domestically and internationally, including, but not restricted to, the raising of monetary funds by and through solicitation, employing federal mails and/or federal interstate wires, as well as and providing documentary materials describing such illicit transaction. Plaintiff alleges that RICO persons, and other persons unknown to plaintiff, acting in concert therewith, are employed by and associated with said RICO enterprise that is engaged in, or activities of which affect, federal interstate and/or foreign commerce, and that said RICO persons, and persons acting in concert therewith, conduct or participate, directly or indirectly, in the conduct of such RICO enterprise's affairs through a RICO pattern of racketeering activity.

84.     Plaintiff alleges that in conducting the business and affairs of the RICO enterprises, and in committing the acts, omissions, misrepresentations, and breaches referred to herein between 2006 and 2017 and continuing up through and including the initiation of these proceedings, defendants engaged in a RICO pattern of racketeering activity in contravention of Title 18 United States Code § 1962(C)) inasmuch as said defendants were employed by, or associated with, said RICO enterprises that are engaged in activities that affect federal interstate and/or foreign commerce, and conducted such

RICO enterprise affairs by and through a RICO pattern of racketeering activity.

## V. RICO §1961(5) PATTERN OF RACKETEERING ACTIVITY ALLEGATIONS

### [TITLE 18 United States Code § 1961(5)]

### Commission of RICO §1961(1)(B) Racketeering Activity

85.     Plaintiff alleges that RICO defendants engaged in the above activities and/or conduct that constitutes the following form of "racketeering activity," as that term is defined pursuant to Title 18 United States Code §1961(1) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"]. Plaintiff alleges that the forms of "racketeering activity" include, and are not restricted to, various formulations of conspiracy to aid and abet, and aiding and abetting a conspiracy:

A. Federal Principal and Aider and Abettor Liability: Title 18 U.S.C.A. §2(a)-(b).

B. Federal Principal and Aider and Abettor Liability re: Aiding and Abetting A Conspiracy: Title 18 U.S.C.A. §2(a)-(b).

C. Federal Principal and Aider and Abettor Liability re: Conspiracy to Commit Aiding and Abetting: Title 18 U.S.C.A. §2(a)-(b)

D. Federal Mail Fraud: Title 18 U.S.C.A. §1341.

E. Federal Mail Fraud re: Aiding and Abetting: Title 18 U.S.C.A. §1341.

F. Federal Mail Fraud re: Conspiracy: Title 18 U.S.C.A. §1341.

G. Federal Mail Fraud re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1341.

H. Federal Mail Fraud re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1341.

I. Federal Wire Fraud: Title 18 U.S.C.A. §1343.

J. Federal Wire Fraud re: Aiding and Abetting: Title 1 U.S.C.A. §1343.

K. Federal Wire Fraud re: Conspiracy: Title 18 U.S.C.A. § 1343.

L. Federal Wire Fraud re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1343.

M. Federal Wire Fraud re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1343.

N. Federal Intangible Personal Property Right Deprivation: Title 18 U.S.C.A. §1346.

O. Federal Racketeering: Title 18 U.S.C.A. §1952.

P. Federal Racketeering re: Aiding and Abetting: Title 18 U.S.C.A. §1952.

Q. Federal Racketeering re: Conspiracy: Title 18 U.S.C.A. §1952.

R. Federal Racketeering re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1952.

S. Federal Racketeering re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1952.

T. Federal Money Laundering: Title 18 U.S.C.A. §1956.

U. Federal Money Laundering re: Aiding and Abetting: Title 18 U.S.C.A. §1956.

V. Federal Money Laundering re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1956.

W. Federal Money Laundering re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1956

X. Federal Money Laundering re: Conspiracy: Title 18 U.S.C.A. §1956(h).

Y. Federal Money Laundering re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1956(h).

Z. Federal Money Laundering re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1956(h).

AA. Federal Criminally Derived Property: Title 18 U.S.C.A. §1957.

BB. Federal Criminally Derived Property re: Aiding and Abetting: Title 18 U.S.C.A. §1957.

CC. Federal Criminally Derived Property re: Conspiracy: Title 18 U.S.C.A. §1957.

DD. Federal Criminally Derived Property re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §1957.

EE. Federal Criminally Derived Property re: Conspiracy to Aid

FF. Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion: Title 18 U.S.C.A. §2314. and Abet: Title 18 U.S.C.A. §1957.

GG. Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Aiding and Abetting: Title 18 U.S.C.A. §2314.

HH. Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy: Title 18 U.S.C.A. §2314.

II. Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §2314.

JJ. Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §2314.

KK. Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion: Title 18 U.S.C.A. §2315.

LL. Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion re: Aiding and Abetting: Title 18 U.S.C.A. §2315.

MM. Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy: Title 18 U.S.C.A. §2315.

NN. Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §2315.

OO. Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §2315.

**B. Commission of RICO §1961(5) Pattern of Racketeering Activity**

**Continuity and Relatedness**

86.     Plaintiff alleges that above activities and/or conduct engaged in by RICO defendants constitute a "pattern of racketeering activity," as that term is defined pursuant to Title 18 United States Code §1961(5) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"]. Plaintiff further alleges that the activities and/or conduct engaged in by defendants was both related as to the modus operandi engaged in by said defendant of depriving plaintiffs of plaintiffs' interests in business and/or property. Plaintiff alleges that the RICO pattern of racketeering activity was continuous inasmuch as the activities and/or conduct engaged in by the RICO defendants exhibited a realistic, long-term threat of continued future injury to plaintiffs' interest in their business and/or property.

87.     Plaintiff is entitled to recover compensatory damages, according to offer of proof at time of trial, including lost lines of credit, lost profits, at a minimum of $1,000,000.00. Plaintiffs are also entitled to recover an award of exemplary and punitive damages where permitted by applicable law. Plaintiff is entitled to recover attorneys' fees, expenses, fees, surcharges, costs, and post-judgment interest.

**VI. MULTIPLE CLAIMS FOR RELIEF FIRST CLAIM FOR RELIEF**

**For Commission of Primary Contravention of RICO Section 1962(C)) of the Racketeer Influenced and Corrupt Organizations Act of 1970] ["RICO"] [Title 18 United States Code §1962(C))] against Defendants**

88.     Plaintiff, repeats and realleges each and every allegation contained in

43

paragraphs "1" through "86" as if more fully set forth at length herein.

[RICO Title 18 United States Code Sections 1961(1)(B) Predicate Offense Contraventions]

Federal Principal and Aider and Abettor Liability: Title 18 U.S.C.A. §2(a)-(b)

Federal Principal and Aider and Abettor Liability re: Aiding and Abetting A Conspiracy:

Title 18 U.S.C.A. §2(a)-(b)

Federal Principal and Aider and Abettor Liability re: Conspiracy to Commit Aiding and

Abetting: Title 18 U.S.C.A. §2(a)-(b)

Federal Mail Fraud: Title 18 U.S.C.A. §1341

Federal Mail Fraud re: Aiding and Abetting: Title 18 U.S.C.A. §1341

Federal Mail Fraud re: Conspiracy: Title 18 U.S.C.A. §1341

Federal Mail Fraud re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1341

Federal Mail Fraud re: Aiding and Abetting a Conspiracy:

Title 18 U.S.C.A. §1341

Federal Wire Fraud: Title 18 U.S.C.A. §1343

Federal Wire Fraud re: Aiding and Abetting: Title 18 U.S.C.A. §1343

Federal Wire Fraud re: Conspiracy: Title 18 U.S.C.A. §1343

Federal Wire Fraud re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1343

Federal Wire Fraud re: Aiding and Abetting a Conspiracy:

Title 18 U.S.C.A. §1343

Federal Intangible Personal Property Right Deprivation: Title 18 U.S.C.A. §1346

Federal Racketeering: Title 18 U.S.C.A. §1952

Federal Racketeering re: Aiding and Abetting: Title 18 U.S.C.A. §1952

Federal Racketeering re: Conspiracy: Title 18 U.S.C.A. §1952

Federal Racketeering re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §1952

Federal Racketeering re: Aiding and Abetting a Conspiracy:

Title 18 U.S.C.A. §1952

Federal Money Laundering: Title 18 U.S.C. §1956

Federal Money Laundering re: Aiding and Abetting: Title 18 U.S.C. §1956

Federal Money Laundering re: Conspiracy to Aid and Abet:

Title 18 U.S.C.A. §1956

Federal Money Laundering re: Aiding and Abetting a Conspiracy:

Title 18 U.S.C.A. §1956

Federal Money Laundering re: Conspiracy: Title 18 U.S.C. §1956(h)

Federal Money Laundering re: Aiding and Abetting a Conspiracy:

Title 18 U.S.C. §1956(h)

Federal Money Laundering re: Conspiracy to Aid and Abet:

Title 18 U.S.C. §1956(h)

Federal Criminally Derived Property: Title 18 U.S.C. §1957.

Federal Criminally Derived Property re: Aiding and Abetting:

Title 18 U.S.C. §1957

Federal Criminally Derived Property re: Conspiracy: Title 18 U.S.C. §1957

Federal Criminally Derived Property re: Aiding and Abetting a Conspiracy:

Title 18 U.S.C. §1957

Federal Criminally Derived Property re: Conspiracy to Aid and Abet:

Title 18 U.S.C. §1957

Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion: Title 18 U.S.C.A. §2314

Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Aiding and Abetting: Title 18 U.S.C.A. §2314

Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy: Title 18 U.S.C.A. §2314

Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Aiding and Abetting a Conspiracy: Title 18 U.S.C.A. §2314

Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy to Aid and Abet: Title 18 U.S.C.A. §2314

Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion: Title 18 U.S.C.A. §2315

Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion re: Aiding and Abetting: Title 18 U.S.C.A. §2315

Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion re: Conspiracy: Title 18 U.S.C.A. §2315

Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense and Conversion re: Aiding and Abetting a Conspiracy:

Title 18 U.S.C.A. §2315

Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense and Conversion re: Conspiracy to Aid and Abet:

Title 18 U.S.C.A. §2315

89.     Plaintiff alleges that RICO defendants engaged in the aforementioned activities, with the intent to harm plaintiff's interest in business and/or property. Plaintiff alleges that the fraudulent activity engaged by said defendants injured plaintiff's business and/or property in connection with their business activities that affect federal interstate commerce, resulting in loss of plaintiff's property interests, business opportunities, and monies.

**RICO Title 18 United States Code § 1961(5) Pattern of Racketeering Activity**

90.     Plaintiff alleges that the afore described activities constitute conduct engaged in by defendants to deprive plaintiff of his interest in business and/or property, by and through commission of federal mail fraud, federal wire fraud, federal money laundering, federal interstate transportation and receipt of property obtained by fraud, false pretense, and/or conversion, and federal racketeering, and are therefore indictable as "racketeering activity," as that term is defined pursuant to Title 18 United States Code §1961(1). The course of conduct engaged in by said defendants constitute both continuity and relatedness of the racketeering activity, thereby constituting a "pattern of racketeering activity, as that term is defined pursuant to Title 18 U.S.C. §1961(5).

91.     Plaintiff alleges that the aforementioned pattern of racketeering activity committed by said defendants is both related and continuous inasmuch as it is designed and/or intended to cause damage and/or injury to the interest in business and/or property of plaintiffs, and plaintiffs reasonably believe and apprehend that such conduct shall and will continue prospectively with correlative long term injury. Plaintiff alleges that similarly

situated victims, including members of the general public, sustained losses by reason of the

conduct alleged against defendants, including, but not restricted to, the following persons:

Defendants, BAQUET, DELAPE, HENDERSON and GIORDANO, and SAGARINO,

INGLIS and BEHARRY (Individually and in the capacity as Directors), and Corporate

defendants (and as corporate entities where applicable).

### RICO Section 1962(C)) Enterprises

92.    Plaintiff alleges that each of the following configurations, for purposes of

plaintiffs' RICO §1962C) claims for relief, constitute a RICO "enterprise," as that term is

defined pursuant to Title 18 United States Code §1961(4) of the Racketeer Influenced and

Corrupt Organizations Act of 1970 ["RICO"][Title 18 U.S.C. § 1961(4)] and within the

strictures of Odom v. Microsoft Corp., 486 F.3d 541 (9th Cir. 2007)(en banc):

**A. RICO Enterprise No. 1**: Defendants, BAQUET, DELAPE, HENDERSON and

GIORDANO, and SAGARINO, INGLIS and BEHARRY(Individually and in the capacity

as Directors), and Corporate defendants (and as corporate entities where applicable),

constitute a RICO enterprise, organized and maintained by and through a consensual

hierarchy of partners, managers, directors, officers, supervisors, agents, deputies, and/or

representatives that formulate and implement policies relative to the illicit and illegal

activities described herein, both domestically and internationally, including, but not

restricted to, the raising of monetary funds by and through solicitation, employing federal

mails and/or federal interstate wires, as well as and providing documentary materials

describing mechanical procedures pertaining to the placement of monetary funds derived

from illegal activities. Plaintiff alleges that RICO persons, and other persons unknown to

48

plaintiff, acting in concert therewith, are employed by and associated with said RICO enterprise that is engaged in, or activities of which affect, federal interstate and/or foreign commerce, and that said RICO persons, and persons acting in concert therewith, conduct or participate, directly or indirectly, in the conduct of such RICO enterprise's affairs through a RICO pattern of racketeering activity.

**B. RICO Enterprise No. 2:** Defendants, BAQUET, DELAPE, HENDERSON and GIORDANO, and SAGARINO, INGLIS and BEHARRY(Individually and in the capacity as Directors), and Corporate defendants (and as corporate entities where applicable), constitute a RICO enterprise, organized and maintained by and through a consensual hierarchy of partners, managers, directors, officers, supervisors, agents, deputies, and/or representatives that formulate and implement policies relative to the funding of alternative investment, both domestically and internationally, including, but not restricted to, the raising of monetary funds by and through solicitation, employing federal mails and/or federal interstate wires, as well as and providing documentary materials describing mechanical procedures pertaining to the placement of monetary funds derived from solicitations. Plaintiff alleges that RICO persons, and other persons unknown to plaintiff, acting in concert therewith, are employed by and associated with said RICO enterprise that is engaged in, or activities of which affect, federal interstate and/or foreign commerce, and that said RICO persons, and persons acting in concert therewith, conduct or participate, directly or indirectly, in the conduct of such RICO enterprise's affairs through a RICO pattern of racketeering activity.

**C. RICO Enterprise No. 3**: Defendants, BAQUET, DELAPE, HENDERSON and

49

GIORDANO, and SAGARINO, INGLIS and BEHARRY(Individually and in the capacity as Directors), and Corporate defendants (and as corporate entities where applicable), constitute a RICO enterprise, organized and maintained by and through a consensual hierarchy of partners, managers, directors, officers, supervisors, agents, deputies, and/or representatives that formulate and implement policies relative to the funding of alternative real estate investment, both domestically and internationally, including, but not restricted to, the raising of monetary funds by and through solicitation, employing federal mails and/or federal interstate wires, as well as and providing documentary materials describing mechanical procedures pertaining to the placement of monetary funds derived from illegal activities. Plaintiff alleges that RICO persons, and other persons unknown to plaintiff, acting in concert therewith, are employed by and associated with said RICO enterprise that is engaged in, or activities of which affect, federal interstate and/or foreign commerce, and that said RICO persons, and persons acting in concert therewith, conduct or participate, directly or indirectly, in the conduct of such RICO enterprise's affairs through a RICO pattern of racketeering activity.

**D. RICO Enterprise No. 4:** Defendants, BAQUET, DELAPE, HENDERSON and GIORDANO, and SAGARINO, INGLIS and BEHARRY(Individually and in the capacity as Directors), and Corporate defendants (and as corporate entities where applicable), constitute a RICO enterprise, organized and maintained by and through a consensual hierarchy of partners, managers, directors, officers, supervisors, agents, deputies, and/or representatives that formulate and implement policies relative to the funding of alternative investment, both domestically and internationally, including, but not restricted to, the

50

raising of monetary funds by and through solicitation, employing federal mails and/or federal interstate wires, as well as and providing documentary materials describing mechanical procedures pertaining to the placement of monetary funds derived from illegal activities. Plaintiff allege that RICO persons, and other persons unknown to plaintiff, acting in concert therewith, are employed by and associated with said RICO enterprise that is engaged in, or activities of which affect, federal interstate and/or foreign commerce, and that said RICO persons, and persons acting in concert therewith, conduct or participate, directly or indirectly, in the conduct of such RICO enterprise's affairs through a RICO pattern of racketeering activity.

93.     Plaintiff alleges that in conducting the business and affairs of the RICO § 1961(4) enterprises, and in committing the acts, omissions, misrepresentations, and breaches referred to herein between 2017 and 2018, and continuing up through and including the initiation of these proceedings, defendants engaged in a RICO pattern of racketeering activity in contravention of Title 18 United States Code §1962(C)) inasmuch as said defendant was employed by, or associated with, said RICO enterprises that are engaged in activities that affect federal interstate and/or foreign commerce, and conducted such RICO enterprise affairs by and through a RICO pattern of racketeering activity.

**[RICO Recovery]**

94.     Plaintiff is entitled to recover, pursuant to Title 18 United States Code §1964(C)), treble damages in the amount to be determined by offer of proof at time of trial. Plaintiff is also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and/or lost business opportunities attributable to the

activities engaged in by defendants committed in furtherance of the Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"][Title 18 U.S.C. §1961 et.seq.].

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST DEFENDANT
## COMMON LAW FRAUD

95.     The relief sought herein exceeds the jurisdictional limits of all other courts, which would otherwise have jurisdiction.

96.     The within action falls within one or more of the exceptions of CPLR § 1602.

97.     That at all times mentioned herein, the plaintiff, DR. WILLIAM BONGIORNO is a natural person, was a resident of the City and State of New York. However, he is now a resident of the State of Florida.

98.     That at all times mentioned herein, the defendants are individuals or companies who conduct business in the State of New York, County of New York and defrauded Plaintiff.

99.     That at all times mentioned herein, the defendants, maintained an office to conduct business in both New York and New York State including overseeing the operations of certain investment activities

100.     That Corporate Defendants, SDRI, INC. and SDRI, S.A., are foreign corporations, with the former incorporated in the Cayman Islands and the later a subsidiary entity in Panama which maintain executive offices in the States and on information and belief continue to operate or invested as a Real Estate holding companies in the greater New York area and New York City and throughout the US.

101.     That Corporate defendants, FHG and FFM are foreign corporations

52

organized under the laws of the State of Delaware with Executive offices in New York City. On information and belief, their principal business is that of an investment advisor, broker dealer and/or holding company.

102.    That from 2007 to the present the Defendants, BAQUET, DELAPE, HENDERSON and GIORDANO, and SAGARINO, INGLIS and BEHARRY(Individually and in the capacity as Directors), and Corporate defendants (and as corporate entities where applicable), enticed the Plaintiff's to make *and maintain* [emphasis added] a considerable investment in real estate related entities, stocks, preferred stocks, notes and warrants in exchange for the promise of lucrative profits, return of principal investment and also a steady stream of rental income.

103.    This agreement to invest in Defendants' enterprises was negotiated with Plaintiff in New York in New York County.

104.    Plaintiff entered into the Agreements in justifiable reliance on Defendants' misrepresentations.

105.    Plaintiff has been damaged by Defendants' misrepresentations, as it would not have entered into the Agreements but for the misrepresentations. Additionally, but for Defendants subsequent misrepresentations, Plaintiff would not have maintained his investment positions and would have earlier initiated the instant suit. As a result, Plaintiff is out of pocket for the damages associated with Defendants' ongoing activities and therefore plaintiff demands contract damages plus punitive damages in the amount of $5.2 million. The complaint also included a demand for attorneys' fees and other costs on each of the causes of action.

106.     Among the misrepresentations was a promise of return on investment but instead of a return of the principal investment, Plaintiff's investment has remained tied up in Defendant's securities, notes or properties with Defendants failing to allow for a fair disposition or redemption of same.

107.     In addition to receiving empty promises Plaintiffs have since learned that defendants, BAQUET, DELAPE, HENDERSON and GIORDANO, and SAGARINO, INGLIS and BEHARRY(Individually and in the capacity as Directors), and Corporate defendants (and as corporate entities where applicable), have defrauded Plaintiff in various ways. On information and belief, the Defendants took advantage of Plaintiff, DR. WILLIAM BONGIORNO's abiding trust in the Defendants and used his good name and his contacts to defraud said Plaintiff and other investors, effectively using same without Plaintiff's knowledge, permission or consent.

108.     On information and belief this worked to the detriment of Defendant's clients or associates and may not have complied with relevant laws and regulations.

109.     That as a result of the foregoing, the plaintiff, DR. WILLIAM BONGIORNO and others similarly situated, have suffered a serious loss of reputation and forgone opportunities as well as the lingering prospect of open-ended legal exposure for Defendants' improprieties, and in particular as to the Plaintiff herein, stemming from Defendants having tricked DR. BONGIORNO, into working for SDRI, INC. in order to try to redeem his investment therein.

110.     That by reason of the foregoing, the plaintiff seeks a sum of money from the defendants, that will reasonably and fairly compensate him for his injuries including lost

opportunities, investment and damages, costs disbursements and legal fees.

## AS AND FOR A THIRD CAUSE OF ACTION
## (BREACH OF CONTRACT and SPECIFIC PERFORMANCE)

111.     The relief sought herein exceeds the jurisdictional limits of all other courts, which would otherwise have jurisdiction.

112.     The within action falls within one or more of the exceptions of CPLR § 1602.

113.     That at all relevant times mentioned herein, the Plaintiff DR. BONGIORNO, was and is a natural person, was a resident of the City and State of New York, and currently is a legal resident of the State of Florida in the United States

114.     That at all times mentioned herein, the defendants are individuals or companies who conduct business in the State of New York and defrauded Plaintiff and similarly situated investors.

115.     That at all times mentioned herein, the defendants, maintained an office to conduct business in New York City and New York State including overseeing the operations of certain real estate investment activities

116.     That Corporate defendants, SRDI, INC. and SDRI, S.A., are foreign corporations, the former in the Cayman Islands and the later a subsidiary entity in Panama which maintain executive offices in the States and on information and belief established continues to operate as a Real Estate holding company securing investments from throughout the US.

117.     That Corporate defendants, FFM and FHG are foreign corporations organized under the laws of the Delaware with Executive offices in New York City. On

information and belief, their principal business was that of an investment advisor, broker dealer and/or holding company.

118.    That from 2007 through to the present the Defendants, BAQUET, DELAPE, HENDERSON and GIORDANO, and SAGARINO, INGLIS and BEHARRY(Individually and in the capacity as Directors), and Corporate Defendants (and as corporate entities where applicable), and  entities they  controlled, enticed the Plaintiff to make and *maintain* considerable investment in real estate in exchange for the promise of lucrative profits, return of principal investment and also a steady stream of rental income.

119.    This agreement to invest in Defendants' enterprises and maintain such investments was negotiated with Plaintiff and other investors in New York City and in New York County.

120.    Instead of a return of his principal investments, Plaintiff's investments have remained tied up in vehicles controlled by Defendants or improperly disbursed by Defendants for their own benefit while failing to allow for a fair disposition of same and in breach of the terms thereof.

121.    In addition, at the request of and with assurances of the defendants, defendants, BAQUET, DELAPE, and GIORDANO, as well as SAGARINO, INGLIS and BEHARRY(Individually and in the capacity as Directors), extended multiple so called "bridge loans" and a promissory note to SDRI, INC. with the promise same were secured by property in Panama in the total amount of $369,833.

122.    That the defendants, BAQUET, DELAPE, and GIORDANO, as well as SAGARINO, INGLIS and BEHARRY(Individually and in the capacity as Directors), and

SDRI, INC., failed to repay said loans and promissory note within the time prescribed under their agreement, sold or otherwise transferred ownership/title to said properties used as collateral to undermine said Plaintiff's interests, and are/were otherwise in breach of contract of their agreement and/or understanding and/or assurances, all to the financial detriment of the plaintiff.

123.    That by reason of the foregoing, the plaintiff, DR. WILLIAM BONGIORNO, have suffered financial loss totaling at least $369,833, not including statutory and accumulated interest, the cost of legal fees and disbursements, and lost opportunities for other viable investments.

124.  That in addition, and by reason of all the foregoing, the plaintiff, DR. WILLIAM BONGIORNO and other similarly place investors, have suffered a serious loss of reputation along with said forgone opportunities as well as lingering prospective and open-ended liability and legal exposure for Defendants' improprieties.

125.    That by reason of the foregoing, the plaintiffs seek a sum of money from the defendants, that will reasonably and fairly compensate them for their injuries including contract damages, costs disbursements and legal fees.


## AS AND FOR A FOURTH CAUSE OF ACTION
### (UNJUST ENRICHMENT)

126.    Plaintiff, DR. BONGIORNO, repeats and realleges each and every allegation contained in paragraphs "1" through "124" as if same were more fully set forth at length herein.

127.    As a result of the conduct described above, Defendants have been unjustly enriched at the expense of Plaintiff, DR. WILIAM BONGIORNO and other investors.

128.    Defendant should be required to disgorge all monies, profits and gains which it has obtained or will unjustly obtain in the future at the expense of said Plaintiff and other investors, and a constructive trust should be imposed thereon for the benefit of Plaintiff and said other investors.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (CONVERSION)

129.    Plaintiff, DR. BONGIORNO, repeats and realleges each and every allegation contained in paragraphs "1" through "127" as if same were more fully set forth at length herein.

130.    Plaintiff has requested that the funds conveyed to defendants identified herein that were delivered by Plaintiff be returned to Plaintiff.

131.    Defendants have taken Plaintiff, WILLIAM BONGIORNO's property belonging to said Plaintiff, and converted the same to their own use, and have refused to return said property and/or funds to Plaintiff.

132.    Plaintiff therefore demands, monetary compensation in the amount of $5.2 million dollars, plus interest, costs, disbursements of this action, and attorneys' fees.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Breached of Obligations Good Faith)

133.    Plaintiff, DR. BONGIORNO, repeats and realleges each and every allegation contained in paragraphs "1" through "132" as if same were more fully set forth at length herein.

134.     An enforceable contract existed between plaintiff and defendants.

135.     Plaintiff performed his obligations under the agreement.

136.     Defendant in turn breached the agreement by failing to honor their promises including but not limited to secreting profits to themselves and exceeding their authority in using corporate entities, forms and assets.

137.     Defendants breached the contract by misusing their corporate entities and This breach included engaging in sham transactions amounting to self-dealing. All the foregoing constitutes a breach of an implied covenant of good faith and fair dealing with plaintiff.

138.     Accordingly, Plaintiff has been damaged in the amount of $5.2 million dollars and therefore demands indemnification for misuse of corporate goodwill and corporate entities.

139.     Plaintiff therefore demands, monetary compensation in the amount of $5.2 million dollars, plus interest, costs, disbursements of this action, and attorneys' fees.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**(VIOLATION OF N.Y. GENERAL BUSINESS LAW § 349)**

140.     Plaintiff, DR. BONGIORNO, repeats and realleges each and every allegation contained in paragraphs "1" through "138" as if same were more fully set forth at length herein.

141.     GBL § 349 declares unlawful "[d]ecptive acts or practices in the conduct of

any business, trade or commerce or in the furnishing of any service in [New York]."

142.    By engaging in the acts and practices above, Defendants have engaged in deceptive and misleading practices in violation of GBL § 349 and demanded are treble damages to the statutory cap.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS.

143.    Plaintiff, DR. BONGIORNO, repeats and realleges each and every allegation contained in paragraphs "1" through "141" as if same were more fully set forth at length herein.

144.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities or provided bridge loans to the Defendants from 2006 to present  including purchasers of FFM preferred stock and all SDRI securities with or traceable to any of the Defendants as well as any Promissory notes or bridge loans who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Defendants.

145.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Defendants or their transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

146.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

147.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has or will retain counsel competent and experienced in class and securities litigation.

148.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)   whether statements made by defendants to prospective investors during the Class Period misrepresented material facts about the business, operations and management of Defendants; and

(c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

149.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for

members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SCIENTER ALLEGATIONS

150.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Defendants, their control over, and/or receipt and/or modification of Defendants' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Defendants, participated in the fraudulent scheme alleged herein.

## UNDISCLOSED ADVERSE FACTS

151.    During the Class Period, defendants materially misled the investors by issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse

information and misrepresented the truth about the Company, its business and operations, as alleged herein.

152.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Defendant's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Defendants and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

153.    Defendants' wrongful conduct, as alleged herein, directly, and proximately caused the economic loss suffered by Plaintiff and the Class.

154.    During the Class Period, Plaintiff and the Class purchased securities of Defendants at artificially inflated prices and were damaged thereby. The price of SDRI, INC. common stock declined when the misrepresentations made to the market, and/or the information alleged herein to had been concealed from the market, and/or the effects thereof,

were revealed, causing investors' losses. The value of FFM preferred stock became worthless when it became evident that written representations that it would dependably pay cumulative interests was determined to be false.

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

155.    At all relevant times, the market for Defendants securities was an efficient market for the following reasons, among others:

(a) Defendants securities met the requirements for listing on certain exchanges;

(b) As a regulated issuer, Defendants filed periodic public reports with the SEC;

(c) Defendants regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Defendants were followed by several securities analysts employed by brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

156.    As a result of the foregoing, the market for Defendant's securities promptly digested current information regarding Defendants from all publicly-available sources and reflected such information in pricing. Under these circumstances, all purchasers of Defendant's securities during the Class Period suffered similar injury

through their purchase of Defendant's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

157.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer who knew that those statements were false when made.

## CLAIM

### Violation of Section 10(b) Of The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

158.    Plaintiff, DR. BONGIORNO, repeats and realleges each and every allegation contained in paragraphs "1" through "157" as if same were more fully set forth at length

herein.

159.   During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

160.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deception upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for securities in violation of Section 10(b) of the Exchange Act and Rule.

161.   All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below:

a.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated  in  a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of as specified herein.

b.   These defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and

a course of conduct as alleged herein in an effort to assure investors of value and

performance and continued substantial growth, which included the making of, or the

participation in the making of, untrue statements of material facts and omitting to state

material facts necessary in order to make the statements made about Defendants and its

business operations and future prospects in light of the circumstances under which they

were made, not misleading, as set forth more particularly herein, and engaged in

transactions, practices and a course of business which operated as a fraud and deceit upon the

purchasers of Defendants securities during the Class Period.

     c.   Each of the Individual Defendants' primary liability, and controlling person

liability, arises from the following facts: (i) the Individual Defendants were high-level

executives and/or directors at the Company during the Class Period and members of the

Company's management team or had control thereof; (ii) each of these defendants, by

virtue of his or her responsibilities and activities as a senior officer and/or director of the

Company was privy to and participated in the creation, development and reporting of the

Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants

enjoyed significant personal contact and familiarity with the other defendants and was

advised of and had access to other members of the Company's management team, internal

reports and other data and information about the Company's finances, operations, and sales

at all relevant times; and (iv) each of these defendants was aware of the

Company's dissemination of information to the investing public which they knew or

recklessly disregarded was materially false and misleading.

d.   The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Defendant's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

e.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Isolagen securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Isolagen's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Defendant's securities during the Class Period at artificially high prices and were damaged thereby.

f.   At the time of said misrepresentations and omissions, Plaintiff and other

68

members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Defendant's was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Defendant's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

g.        By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

h.        As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

162.    Plaintiff repeats and realleges each and every allegation of paragraphs "1" through "161" with the same force and effect as if each were more fully set forth at length herein.

163.    The Individual Defendants acted as controlling persons of Defendant's within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing

public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.   The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

164.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

165.    Defendants, BAQUET, DELAPE, HENDERSON and GIORDANO, and SAGARINO, INGLIS and BEHARRY (Individually and in the capacity as Directors), and Corporate defendants (and as corporate entities where applicable), each violated Section 1O(b) and Rule 1Ob-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## THIRD CLAIM

## BREACH OF FIDUCIARY DUTY
## VIOLATION OF INVESTMENT COMPANY ACT § 36(b)

166.    Plaintiff, DR. BONGIORNO,  repeats and realleges each and every allegation marked and designated paragraphs "1" through "166" as if each were more fully set forth at length herein.

167.    Defendants BAQUET, DELAPE, GIORDANO, and HENDERSON, and SAGARINO, INGLIS AND BEHARRY (Individually and in the capacity as Directors), and Corporate defendants (and as corporate entities where applicable), have breached their fiduciary duty to investors including Plaintiff in a myriad of ways including but not limited to taking excessive compensation under **Investment Company Act § 36(b).**

168.    This breach includes not disclosing compensation by mischaracterizing compensation as Bridge Loans or merely borrowing funds or transferring funds without adequate documentation or otherwise engaging in actions constituting a breach of fiduciary duty or investment advisor or as corporate officers or directors and taking actions that amount to shareholder oppression or have served to deepen the insolvency of entities under their management without regard for the interests of equity holders/ or creditors.

## JURY TRIAL DEMAND

Plaintiff, DR. BONGIORNO, respectfully requests a trial by jury on all matters set forth herein.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

i.    Determining that this action is a proper class action, designating Plaintiff

as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the

Federal Rules of Civil Procedure and Plaintiff's counsel as lead counsel.

       ii.      Awarding compensatory, punitive and treble damages in favor of

Plaintiff and the other Class members against all defendants, jointly and severally, for all

damages sustained as a result of defendants' wrongdoing, in an amount to be proven at

trial, including interest thereon.

       iii.     Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

       iv.     Such other and further relief as the Court may deem just and proper.

Dated: Mineola, New York
      September 4, 2020

                  Yours, etc.
                  JOSEPH R. BONGIORNO & ASSOCIATES, P.C.
                  Attorneys for Plaintiff, DR. WILLIAM BONGIORNO

BY:
                  JOSEPH R. BONGIORNO, ESQ. (1832)
                  250 Mineola Boulevard
                  Mineola, New York 11501
                  (516) 741-2405