UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_09/20/2021__
```

-------------------------------------------------------------------X
                                :

DR. WILLIAM BONGIORNO and BBB LAND   :
HOLDINGS, S.A.,
                                  :

              Plaintiffs,      :          20-cv-7288 (LJL)
                                  :

         -v-                  :         OPINION AND ORDER
                                  :

WILLIAM BAQUET, et al.,               :

              Defendants.      :

-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendants Fordham Financial Management, Inc., Fordham Holdings Group, Inc., Six

Diamond Resorts International, Inc., Six Diamond Resorts International, S.A., William Baquet,

Phyllis Henderson, Charles Giordano, Bruce Inglis, Bob Sagarino, Richard Kiibler, and

Premchand Beharry move to dismiss the Amended Complaint, pursuant to Federal Rule of Civil

Procedure 12(b)(1) for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil

Procedure 12(b)(6) for failure to state a claim for relief, and pursuant to Federal Rule of Civil

Procedure 9 for failure to allege fraud with particularity.  Dkt. No. 66.  Defendants also move for

an order sanctioning Plaintiffs under Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927.

Dkt. No. 87.  In addition to opposing Defendants' motions, Plaintiffs William Bongiorno and

BBB Land Holdings, S.A. move to strike the exhibits submitted with Defendants' reply in

support of their motion to dismiss.  Dkt. No. 101.

      For the following reasons, the motion to strike is granted in part and denied in part, the

motion to dismiss is granted, and the motion for sanctions is denied.

# BACKGROUND

The facts stated in the Amended Complaint are accepted as true for purposes of this motion.

## I.    The Relevant Parties

Plaintiff William Bongiorno ("Bongiorno") is the sole owner of BBB Land Holdings, S.A. ("BBB Land" and collectively with Bongiorno, "Plaintiffs"), a corporation organized and existing under and by virtue of the law of Panama.  Dkt. No. 41 ("Amended Complaint" or "Am. Compl.") ¶¶ 3-4, 66, 99.

This case concerns loans and investments made by Bongiorno beginning in 2007 to Defendant Six Diamonds Resorts International, Inc. ("SDRI, Inc."), a company with a Panamanian subsidiary, Defendant Six Diamonds Resorts International, S.A. ("SDRI, S.A."), whose business is "to attempt to develop world class real estate resorts and communities in Panama for tourism and retirement destinations." *Id.* ¶¶ 16-17.  Defendants Frank Delape ("Delape") and William Baquet ("Baquet") created this subsidiary of SDRI, Inc. *Id.* ¶¶ 5-6, 16, 24.  They also opened Defendant Landbridge Holdings International, S.A. ("LBH"), a company incorporated in Panama, as a vehicle for land acquisition and the development of high-end resorts in Panama. *Id.* ¶¶ 18, 23-24.  LBH became a joint venture partner with SDRI, S.A., with the parent company SDRI, Inc. incurring all expenses of LBH. *Id.* ¶ 24.

Defendant Delape was CEO of SDRI, Inc. before Plaintiff Bongiorno served as CEO from 2010 to 2015. *Id.* ¶¶ 30, 64.  Defendant Richard Kiibler ("Kiibler") is alleged to be "Delape's right hand man." *Id.* ¶¶ 7, 29.  Defendants Bob Sagarino ("Sagarino"), Bruce Inglis ("Inglis"), and Premchand Beharry ("Beharry") are on the Board of Directors of SDRI, Inc. *Id.* ¶¶ 11-13, 20.

Defendant Baquet was also CEO of Defendant Fordham Financial Management, Inc. ("FFM"), a New York-based registered broker-dealer and member of the National Association of Securities Dealers. *Id.* ¶¶ 14, 51, 61. Defendant Charles Giordano ("Giordano") was and is a financial advisor at FFM and was a financial advisor to Bongiorno. *Id.* ¶¶ 8, 14, 21-22. Defendant Phyllis Henderson was and is a Compliance Officer for FFM. *Id.* ¶ 9. Defendant ThinkEquity is a division of FFM. *Id.* ¶ 19. FFM is owned by Defendant Fordham Holdings Group Inc. ("FHG"). *Id.* ¶¶ 15, 40.

## II. The Relevant Events

### A. Bongiorno's Involvement with SDRI, Inc.

#### 1. Bongiorno's Introduction to SDRI, Inc. and Initial Investments in the Company in 2007

Bongiorno first met FFM financial advisor Giordano in 2006. *Id.* ¶ 21. Giordano enticed Bongiorno to invest in a company called Isologen, an alleged maker of anti-wrinkle products, whose CEO was Delape. *Id.* ¶¶ 21, 23. The investment performed well, and Bongiorno secured a return on his investment.[1] *Id.* ¶ 22.

In or about 2007, Delape and Baquet invited Bongiorno and others on an all-expenses paid trip to Panama to pitch an opportunity to participate in SDRI, Inc.'s initial public offering ("IPO") and to make bridge loans to the company.[2] *Id.* ¶ 25. During the presentations in Panama, Baquet and Delape "personally guaranteed" that investments in SDRI, Inc. would be secured by land held by LBH, which was then in a joint venture with SDRI, Inc.'s subsidiary SDRI, S.A. *Id.* ¶ 26. One of the properties purchased by SDRI, S.A. was called the "Brenon

---

[1] Plaintiffs allege that Isologen stock later collapsed, that the company was subject to "sundry derivative actions and Class Action Lawsuits alleging fraud and misrepresentation," and that it filed for protection under Chapter 11 of the Bankruptcy Code in June 2009. *Id.* ¶¶ 22-23.
[2] By adopting in this section the "loan" locution used by the Amended Complaint, the Court does not prejudge how best to characterize under the law the funding provided by Bongiorno to SDRI.

Property." *Id.* ¶¶ 26, 79.  In 2007, Bongiorno purchased 500,000 shares of SDRI, Inc. BB stock for $1 a share for a total of $500,000.  *Id.* ¶ 28.  Later that same year, he purchased an additional 100,000 shares of SDRI, Inc. CC stock at $1 a share, for a total of $100,000.  *Id.*

In purchasing these shares, Bongiorno relied on Baquet and Delape's statements that "LBH owns all the properties" and that the properties are worth $30 million in total.  *Id.* ¶ 29. The Amended Complaint alleges, however, that the LBH land Bongiorno was promised would secure his investments was "not owned by defendants" but by the Panamanian government.  *Id.* ¶ 27.  The land took the form of Right of Possession ("ROP") parcels that "present unique obstacles to financing, developing and construction and to rationalizing title."  *Id.*  In fact, "[c]ertain ROP lands are not recorded in any central recording system."  *Id.*  In addition, investors were not informed that a rival for the property was contesting the ROP, which further complicated the possibility of possession and development.  *Id.*  None of the investors were advised of these obstacles before signing on.  *Id.*  Further, Bongiorno did not know that Kiibler, who had personally done the appraisal, was "Delape's right hand man."  *Id.* ¶ 29.

### 2.    Bongiorno's Loans to SDRI, Inc. Beginning in 2007 and His Tenure as CEO from 2010 to 2015

During this time, Bongiorno also made several of what he characterizes as loans to SDRI, Inc.  First, close in time to the purchase of stock from the IPO in 2007, Bongiorno was asked by Giordano, Delape, and Baquet to make a bridge loan of $50,000 to SDRI, Inc., which was repaid shortly after it was extended.  *Id.* ¶ 34.

Almost simultaneously after he was repaid, "in 2007 or 2008" or "in August 2008,"[3] Bongiorno made another bridge loan to SDRI, Inc., this time, for $101,000 at the request of

---

[3] The Amended Complaint alleges both dates.  *See id.* ¶¶ 36 ("2007 or 2008"), 72 ("August 2008").

Baquet and Delape and with additional assurances from Giordano, Baquet, and Delape "that the investment was good and secured by land." *Id.* ¶¶ 34, 36, 72.  The Amended Complaint alleges that Baquet represented to Bongiorno that the note would be secured by a "first lien on the Brenon Property," that the Brenon Property had an appraised value of $8 million, and that the note would be repaid in six months from the anticipated sale or mortgaging of the Brenon Property with an 8% annual interest earned. *Id.* ¶¶ 72-73.  The Amended Complaint also alleges Bongiorno entered into the loan based on the representation that he was receiving a pro rata share of ownership in the Brenon Property. *Id.* ¶ 73.  The appraisal of the Brenon Property was obtained by Kiibler who—unbeknownst to Bongiorno and other investors—worked for Delape; there was no qualified appraisal on the Brenon Property. *Id.* ¶¶ 72, 76.  Baquet and Delape allegedly knew this $8 million valuation was "severely excessive and inflated" and was "insufficient to pay off the loans secured by" the property. *Id.* ¶ 72.  After receiving the promissory note prepared at SDRI, Inc.'s offices in Texas, Bongiorno mailed back a check for $101,100[4] from New York. *Id.* ¶ 74.

Then, in April 2009, Bongiorno made another loan to SDRI, Inc. in the sum of $100,000 at the request of Baquet and Delape who told him that the loan was needed as operating capital and that repayment would be secured by the Brenon Property. *Id.* ¶¶ 36, 79.  This second promissory note stated:  "[I]n the event of a sale of the Brenon Properties, the proceeds of such sale shall be applied first to the repayment of indebtedness held by the mortgagee and second, to the payment of the amounts due under this note . . . proceeds after payment of the mortgagee

---

[4] The Amended Complaint describes this loan as one for $101,000 in some places, *see e.g.*, *id.* ¶¶ 34, 36, and as one for $101,100 in other places, *see, e.g.*, *id.* ¶¶ 72-74.  For consistency, the $101,000 amount will be used when referring to this loan, but this usage does not reflect a conclusion on the actual amount of the loan.

paid on a pro-rata basis, if not in full." *Id.* ¶ 80.  As with the previous loan, Bongiorno decided

to make this loan based on the representations that he was a secured lender to SDRI, Inc., that he

would be receiving a pro rata share of ownership in the Brenon Property, that the land would be

sold or mortgaged so that the note would be paid off in six months with an 8% annual interest

earned, and that the property was valued at $8 million. *Id.* ¶ 81.  Again, the promissory note was

prepared in Texas and emailed to Bongiorno in New York; upon receipt, he mailed a check back

to SDRI, Inc.'s offices in Texas.  *Id.* ¶ 83.

In 2010, Bongiorno agreed to become CEO of SDRI, Inc., taking over the position held

by Delape. *Id.* ¶ 30.  As CEO, Bongiorno "br[ought in] a major hotel hotel partner willing to

participate in the development," but Baquet and Delape "were unwilling to enter into the

required negotiations." *Id.* ¶ 33.  Bongiorno therefore resigned as CEO on December 1, 2015.

*Id.* ¶¶ 33, 63.

During the period in which he was CEO, Bongiorno again at the request of Baquet and

Delape made a series of loans totaling $169,833 "to keep SDRI, Inc. going." *Id.* ¶ 37.  In

December 2014, Bongiorno requested a third promissory note for this amount because "he was

concerned about the lack of progress in the development of the Panamanian properties." *Id.* ¶

87.  When he decided to resign as CEO, Bongiorno demanded that Baquet provide the

promissory note. *Id.* ¶ 37.  Bongiorno was told by Baquet with reassurance from Delape "that

this note is collateralized and [that] payment [would be made] for all past issuance out of either

the mortgaging or sale of the Brenon property, which had been purchased by SDRI, S.A." *Id.* ¶

37.  According to Bongiorno, the note stated that he was a secured lender to SDRI, Inc., that he

was receiving a pro rata share of ownership in the Brenon Property, that the land would be sold

or mortgaged so that the note would be paid off in six months with an 8% annual interest earned,

and that the property was valued at $8 million.  *Id.* ¶ 89.  SDRI, Inc.'s New York offices

prepared this note and emailed it to Bongiorno in Panama.  *Id.* ¶¶ 87-88.  Bongiorno had made

these loans totaling $169,833 via ACH and wire transfers from New York to SDRI, Inc. in

Texas.  *Id.* ¶ 94.

In short, over this period of time, Bongiorno made loans of $101,000, $100,000, and

$169,833 to SDRI, Inc. in exchange for three promissory notes based on various representations

by Baquet and Delape.

The Amended Complaint also alleges that Baquet and Delape issued similar promissory

notes to other lenders during 2008 and 2009.  *Id.* ¶ 95.  Those lenders were also all told the "false

appraisal of the property" for $30 million, that the loans were secured by the properties, and that

they would receive repayment with interest within six months after the property was mortgaged

or sold.  *Id.*  At least fifty other loans were secured for SDRI, Inc. through these representations.

*Id.* ¶ 96.  The promissory notes in these cases were all sent by email or mail from SDRI, Inc.'s

Texas offices, and the lenders sent money by mailed check or wire transfer to the SDRI, Inc.'s

Texas bank account.  *Id.* ¶ 97.

### 3.     The 2017 Brenon Property Sale

After resigning as CEO in 2015, Bongiorno continued to be involved with SDRI, Inc.  *Id.*

¶ 63.  He worked to resolve the ROP title issues and to identify "credible blue-chip deal partners

to make a premium resort a reality."  *Id.*  In 2017, one blue-chip resort provided a commitment,

which was negotiated by Bongiorno.  *Id.*  When Baquet "nixed" a prospective deal "on what

looked like pretextual grounds," Bongiorno "became worried."  *Id.*

Then, in 2017, Baquet and Delape sold the Brenon Property for $650,000 without

advising Bongiorno or paying off his loans to SDRI, Inc., even though the Brenon Property was

allegedly the collateral to the third promissory note with language referencing paying off the two

previous notes totaling $201,000.  *Id.* ¶¶ 38, 63.  Delape, Baquet, and the SDRI, Inc. board members promised in writing that Bongiorno would receive repayment of $370,833[5] plus interest.  *Id.* ¶ 63.  But no repayment or payment of interest was made to Bongiorno after the sale of the Brenon Property.  *Id.*

The next year, in 2018, Bongiorno found out that the Brenon Property had been sold and "there was never any intention to pay off the debt," allowing him to "realize[] he was the victim of an elaborate scheme to defraud him."  *Id.*  Specifically, Bongiorno learned for the first time in a "heated telephone call" with Baquet, *id.* ¶¶ 84, 91, that the property had been sold in the previous year for $650,000, substantially less than the previously claimed value of $8 million, *id.* ¶ 75.  Bongiorno was also told by Baquet that Baquet and Delape had no intention and never had any intention of repaying the loans and that the proceeds of the sale were being used as "operating expenses" or "operating capital."  *Id.* ¶¶ 75, 84, 91.

The three promissory notes have never been repaid.  *Id.* ¶¶ 77, 85, 92.

### 4.    The Alleged Theft of Stock

In 2020, Bongiorno learned that certain stock certificates of his were in the possession of Baquet and Delape's lawyers, and though he demanded their return, Baquet and Delape refused. *Id.* ¶ 68.

When Bongiorno agreed to become CEO of SDRI, Inc. in 2010, he did so in exchange for an opportunity to invest $250,000 for a 5% share of LBH and an additional 3 million shares of SDRI, Inc.  *Id.* ¶¶ 30-31, 64.  When he considered resigning in 2014, Baquet, Delape, and board members Sagarino, Inglis, and Beharry enticed him to stay with the grant of "a small monthly stipend" and an additional 5% interest in LBH, for a total of 10%, making him a minority owner

---

[5] Another part of the Amended Complaint alleges Bongiorno is owed $369,833.  *Id.* ¶ 39.

of LBH, with Baquet and SDRI, Inc. splitting the remaining 90% ownership interest in the company.  *Id.* ¶¶ 32, 65, 135.  Baquet and Delape assured him that his 10% interest in LBH meant he owned 10% of the land held by the company.  *Id.* ¶¶ 32, 66.

Between 2010 and 2015, while Bongiorno was CEO of SDRI, Inc., LBH was dissolved, and Bongiorno's ownership interest in the company was converted into shares in various Panamanian companies that either had title to the land or ROPs in the land.  *Id.* ¶¶ 66, 100. Ownership of the stock was placed by Bongiorno in the name of BBB Land.  *Id.* ¶ 66.  The total value of the land was represented by Delape and Baquet to be $30 million, and therefore the value of Bongiorno's 10% share was $3 million.  *Id.* ¶¶ 66, 100.

When Bongiorno resigned as CEO of SDRI, Inc. in 2015, Baquet directed him to turn over all files in his possession relating to SDRI, Inc., and Bongiorno inadvertently turned over the stock certificates to the Panamanian companies in those files.  *Id.* ¶¶ 68, 101.  In 2020, Bongiorno learned of this error and had his lawyers request the return of the stock certificates from Baquet and Delape's lawyers but Baquet and Delape refused to consent.  *Id.* ¶¶ 68, 102. On behalf of Baquet and Delape, Kiibler told Bongiorno that their lawyers no longer had the certificates but would not say where they were.  *Id.* ¶¶ 68, 102.  The Amended Complaint alleges, on information and belief, that the certificates were sent to SDRI, Inc. in New York or Texas and that Baquet and Delape ordered that ownership be transferred to SDRI, Inc.  *Id.* ¶¶ 68, 103-04.  Bongiorno claims Baquet and Delape's refusal to return the certificates constitutes conversion.  *Id.* ¶¶ 68-69, 104-05.

### B.     Bongiorno's Involvement with FHG and FFM

#### 1.     Bongiorno's 2008 Investments in FHG

In 2008, Bongiorno was also induced to invest in FHG, the holding company of FFM, by Baquet (CEO of FFM) and Giordano (a financial advisor at FFM).  *Id.* ¶¶ 21, 40-55.  In June

2008, after being approached by Baquet, Bongiorno purchased 100,000 shares of Series BB cumulative preferred stock in FHG at $5 a share, for a total of $500,000. *Id.* ¶ 40. The shares carried a 7%-8% cumulative dividend paid annually, and Bongiorno received 10% "warrant coverage." *Id.* The 100,000 shares constituted the entire series. *Id.* ¶ 50. Before purchasing these shares, Bongiorno consulted with his investment advisor Giordano who told him "all previous investors are very happy with the investment in the past series of preferred stocks" but withheld the fact that no dividends had ever been paid. *Id.* ¶ 41. A few months later, in November 2008, again on the advice of Baquet and Giordano, Bongiorno purchased 20,000 shares of Series CC preferred stock in FHG at $5 per share, for a total of $100,000. *Id.* ¶ 43. These shares also "purport[ed] to carry an annual cumulative dividend and warrant coverage." *Id.* ¶ 44. Notably, "the Series BB and CC issues gave [Bongiorno] the right to warrants issued from future deals FHG participated in" with Bongiorno having a contractual right to 12% of FHG's 100% of warrants issued. *Id.* ¶ 47.

The Amended Complaint alleges that since Bongiorno's purchase of preferred stock, "there is no proof that FHG has ever paid any cumulative dividends." *Id.* ¶ 48. The funds from the sale of the preferred stock ostensibly were to be used by FFM to recruit brokers, retire previous preferred stock issues, and for operating capital. *Id.* ¶¶ 45, 53. But "not all the monies were used as promised." *Id.* ¶ 54. Further, the Amended Complaint alleges that Henderson, FFM's Chief Compliance Officer, upon direction from Baquet, deceptively referred to the dividend payments as "interest" payments earned. *Id.* ¶ 51. Use of this nomenclature led Bongiorno to "think of these 'dividends' as 'interest' payments and consequently like bonds, earned interest payable to investors" and was intended to make Bongiorno "believe he actually had an iron clad secure investment kindred to a secured debt to prevent him from filing a

complaint with regulators or filing suit before any statute of limitations might elapse." *Id.* In addition, the Amended Complaint alleges that, for the years spanning 2008 and 2009 when Bongiorno purchased these shares, Baquet failed to sign CEO certifications certifying written compliance policies and written supervisory procedures, and was later sanctioned by regulators for this conduct. *Id.* ¶ 61.

### 2.    The 2018 ThinkEquity Transaction with FFM

In or about 2018, FFM entered into an Office of Supervisory Agreement with ThinkEquity, allegedly resulting in "a severe dilution of [Bongiorno's] warrant rights in future deals" as provided for by his Series BB and CC cumulative preferred stock deals. *Id.* ¶¶ 56, 59. As part of the agreement, 80% of FHG's warranty rights in any new deals FHG was involved in were transferred to ThinkEquity. *Id.* For example, before the ThinkEquity transaction, if FFM was entitled to 100,000 warrants as part of a new deal, FHG would receive 100% of those warrants, and Bongiorno would receive 12% of FHG's warrants (i.e., warrants to purchase 12,000 shares). *Id.* ¶ 57. After the ThinkEquity transaction, on the same hypothetical new deal, FHG would receive only 20,000 warrants, and Bongiorno would thus receive 12% of that figure—warrants to purchase only 2,400 shares. *Id.* ¶ 58. The Amended Complaint alleges that Baquet, as CEO of FFM and FGH, was involved in this transaction that reduced Bongiorno's distribution of his share of FHG's warrant allocations. *Id.* ¶ 59.

### PROCEDURAL HISTORY

Plaintiffs filed their original complaint in September 2020. Dkt. Nos. 1, 4.[6] The complaint was filed as a putative class action pursuant to Sections 10(b) and 20(a) of the

---

[6] Plaintiffs attempted to file their complaint on September 8, 2020 but it was rejected for a filing error. Dkt. No. 1. The complaint was accepted for filing on September 17, 2020. Dkt. No. 4. The time difference is immaterial here.

Securities Exchange Act and Rule 10b-5 promulgated thereunder.  Dkt. No. 4 ¶ 1.  Plaintiffs also asserted claims for violations of the Investment Company Act of 1940 § 36(b), as well as the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*.  *Id.*

On December 2, 2020, Plaintiffs filed their Amended Complaint, which contains ten claims.  Am. Compl. ¶¶ 108-194.  Count One alleges a violation of RICO, 18 U.S.C. § 1962(c).  *Id.* ¶¶ 108-121.  Plaintiffs allege that Baquet and Delape participated in the affairs of an enterprise, which is identified as SDRI, Inc., through a pattern of racketeering activity.  *Id.* ¶¶ 111-113.  The Amended Complaint alleges two schemes in relation to the RICO violation: (1) the promissory-note(s) scheme from 2008 through 2014 during which Delape and Baquet "defraud[ed] lenders with the same false promises of a return on their investment," *id.* ¶ 109; and (2) the theft-of-stock scheme pursuant to which Baquet and Delape stole the stock of BBB Land valued at $3 million, *id.* ¶¶ 118-119.  Plaintiffs allege that the schemes were committed through the predicate acts of mail fraud, wire fraud, and interstate transportation of stolen property, in violation of 18 U.S.C. §§ 1341, 1343, and 2314.  *Id.* ¶ 110.

The remaining counts sound in state common law.  Count Two alleges a claim for common law fraud against SDRI, Inc., SDRI, S.A., Baquet, Delape, Kiibler, and SDRI, Inc.'s board members Sagarino, Inglis, and Beharry.  *Id.* ¶¶ 131-143.  Plaintiffs allege that between 2008 and 2014, these Defendants defrauded Plaintiffs as to the value of the land allegedly owned by LBH, which was part of the inducement to Bongiorno to purchase stock in SDRI, Inc.  *Id.* ¶¶ 131-133.  Plaintiffs allege the value of the stock was fraudulently inflated and based upon a false and fraudulent appraisal of the land by the Defendants.  *Id.* ¶ 134.  They also allege that the written agreements pursuant to which Bongiorno acquired a 10% interest in LBH falsely assured him that he had a 10% ownership interest in the land allegedly owned by LBH, *id.* ¶¶ 136-138,

and that defendants failed to disclose "that the land was mostly ROPs and therefore not owned by LBH," *id.* ¶ 137.  Plaintiffs further allege that, contrary to the representations that had been made to him, Defendants "had no intention of developing the Panamanian properties despite the efforts of [Bongiorno] to bring in hotel development partners, such as the Hilton Hotels & Resorts and the Dream Hotel Group."  *Id.*  ¶ 139.

Count Three alleges common law fraud with respect to the loans against the same group of Defendants as are named in Count Two.  *Id.* ¶¶ 144-150.   Plaintiffs allege Bongiorno was defrauded in connection with the three promissory notes he executed in favor of SDRI, Inc., which were never repaid.  *Id.* ¶¶ 145-146.  Plaintiffs allege SDRI, Inc. never had any intention of repaying the loans made by Bongiorno and others.  *Id.* ¶ 146.

Count Four alleges common law fraud against Baquet and FHG in connection with Bongiorno's FHG investment.  *Id.* ¶¶ 151-165.  Plaintiffs allege that Bongiorno was fraudulently induced to buy the two tranches of FHG stock, in June 2008 and November 2008, respectively, by false promises with respect to the dividends and to the warrants and that instead of receiving the warrant protection he was expecting, Baquet and FHG diluted the value of the stock and the warrants by entering into the Office of Supervisory Agreement with ThinkEquity in or about 2018.  *Id.* ¶¶ 152-163.

Count Five alleges common law fraud and breach of fiduciary duty against Giordano, Henderson, and FFM for failing to disclose their financial interests that were in conflict with those of Bongiorno.  *Id.* ¶¶ 166-172.  Count Six against SDRI, Inc., SDRI, S.A., Baquet, and Delape, alleges breach of contract for failure to repay the loans related to the three promissory notes from the proceeds from the sale of the Brenon Property.  *Id.* ¶¶ 173-176.  Count Seven, against Baquet, FHG, FFM, and ThinkEquity, alleges breach of contract in connection with the

warrant protection as part of Bongiorno's FHG investment. *Id.* ¶¶ 177-183.  Count Eight alleges

unjust enrichment against Baquet, Delape, Kiibler, Giordano, Sagarino, Inglis, Beharry, FFM,

FHG, SDRI, Inc., SDRI, S.A., LBH, and ThinkEquity.  *Id.* ¶¶ 184-186.  Count Nine alleges

Baquet, Delape, and SDRI, Inc. unlawfully converted Plaintiffs' stock certificates.  *Id.* ¶¶ 187-

191.  Finally, Count Ten alleges a violation of the New York consumer fraud law, GBL § 349,

against all Defendants.  *Id.* ¶¶192-194.

Defendants filed their motion to dismiss on December 21, 2020.  Dkt. No. 66; *see also*

Dkt. Nos. 89 (Plaintiffs' opposition), 95 (Defendants' reply).  With their reply, Defendants also

filed an affidavit with four attached exhibits.  Dkt. No. 96.  Plaintiffs filed a motion to strike

these four exhibits.  Dkt. No. 101; *see also* Dkt. Nos. 104 (Defendants' opposition), 106

(Plaintiffs' reply).  In addition, Defendants filed a motion for sanctions on January 22, 2021.  Dkt

No. 87; *see also* Dkt. Nos. 92 (Plaintiffs' opposition), 97 (Defendants' reply).

## LEGAL STANDARD

Defendants move to dismiss the Amended Complaint pursuant to Federal Rules of Civil

Procedure 12(b)(6) for failure to state a claim and 9(b) for failure to allege fraud with

particularity.[7] Dkt. Nos. 66, 67.

---

[7] Defendants also argue that the action should be dismissed under Rule 12(b)(1) for lack of
subject matter jurisdiction because the RICO claim, which is the sole basis of federal
jurisdiction, does not state a claim.  Dkt. No. 95 at 11; *see also* Dkt. No. 67 at 15.  "Whether a
federal court possesses federal-question subject matter jurisdiction and whether a plaintiff can
state a claim for relief under a federal statute are two questions that are easily, and often,
confused."  *Carlson v. Principal Fin. Grp.*, 320 F.3d 301, 305-06 (2d Cir. 2003).  "[I]n order to
sustain federal jurisdiction, the complaint must allege a claim that arises under the Constitution
or laws of the United States and that is neither made solely for the purpose of obtaining
jurisdiction nor wholly insubstantial and frivolous."  *Id.* at 306.  The Amended Complaint here,
on its face, alleges a federal RICO claim, and "it cannot be said that [the] complaint is 'plainly
insubstantial' or that it fails to present any issue worthy of adjudication."  *Nowak v. Ironworkers
Loc. 6 Pension Fund*, 81 F.3d 1182, 1190 (2d Cir. 1996).  Therefore, there is "a sufficient basis
for jurisdiction," and the Court "reserve[s] further scrutiny for an inquiry on the merits."  *Id.* at
1189.

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  On a motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff.  *See York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002).  As this requirement "is inapplicable to legal conclusions," "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft*, 556 U.S. at 678.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx v. Siracusano*, 563 U.S. 27, 46 (2011).

In addition, claims for fraud must be pled with particularity to satisfy the heighted pleading requirements of Rule 9(b).  Particularity "requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (internal quotation marks omitted).  Although "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally," Fed R. Civ. P. 9(b), "plaintiffs must allege facts that give rise to a strong inference of

fraudulent intent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).  Plaintiffs may

raise this inference "either (a) by alleging facts to show that defendants had both motive and

opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness." *Id.* at 290-91.

## DISCUSSION

### I.       Plaintiffs' Motion to Strike

As a threshold matter, Plaintiffs have moved to strike four exhibits, Dkt. Nos. 96-1

("Exhibit A"); 96-2 ("Exhibit B"); 96-3 ("Exhibit C"); 96-4 ("Exhibit D"), submitted by

Defendants with their reply in support of their motion to dismiss and included by Defendants to

show that Bongiorno's claims arise from securities transactions, Dkt. No. 96 ¶ 5.  Plaintiffs

contend that the four exhibits should be stricken because they are not referenced in the Amended

Complaint, are not relied upon by Bongiorno, and are not signed by him.  Dkt. No. 102 at 2.

Plaintiffs argue that the exhibits cannot be considered by the Court without converting the

motion to dismiss into one for summary judgment.  *Id.*  Defendants, on the other hand, argue that

Plaintiffs' claims are based on these specific transaction documents and are thus properly before

the Court on a motion to dismiss.  Dkt. No. 104 at 3-4.

Exhibit A, according to Defendants, relates to Bongiorno's 2007 investment in the stock

of SDRI and his first loan of $50,000 that was repaid and is not at issue in this case.  Dkt. No. 96

¶ 2.  Exhibit A contains the cover page and excerpts from an April 2007 private placement

memorandum.  Dkt. No. 96-1.  It reflects that investors were offered the opportunity to purchase

Units of SDRI, S.A. comprised of (a) 25,000 shares of common stock and (b) a $50,000

promissory note, for a purchase price of $50,025 per Unit.  *Id.* at ii, 1.  FFM was the Placement

Agent.  *Id.*

Exhibit B, Defendants contend, relates to Bongiorno's $101,000 payment to SDRI on August 18, 2008.  Dkt. No. 96 ¶ 3.  It is a copy of a Securities Purchase Agreement ("SPA") containing the terms of an August 13, 2008 private placement offering by SDRI, Inc.  Dkt. No. 96-2.  The SPA reflects that investors were offered the opportunity to purchase Units of SDRI, Inc., at $50,500 per Unit, comprised of (a) 50,000 Ordinary Shares and (b) a $50,000 convertible promissory note, "which principal of the Note is due and payable six (6) months from the final closing date of the Offering, convertible at any time and from time to time on or after the date of issue at the Purchaser's option into . . . ordinary shares of the Company" at a specified conversion price.  *Id.* at 2.  FFM was the Placement Agent.  *Id.*

The SPA provides that SDRI, Inc. "has agreed to secure the repayment of the Notes and any other amounts owed to the Purchasers . . . as set forth in Section 4 below through the Brenon Lien on the Brenon Property."  *Id.* at 3.  Section 4 notes that following final closing of the offering, the Company "will use its best efforts to secure its payment obligations under the Notes, by obtaining a first lien on the Brenon Property" but that "[t]he Notes will remain unsecured" until the lien is effectuated and "[n]o assurances can be given as to when, if ever, the Brenon Lien will be legally and validly in place or the resale value of such Brenon Property."  *Id.* ¶ 4(b).  The SPA also includes the form promissory note, which provides that, upon an "Event of Default," the Company will use "its reasonable best efforts to sell the Brenon Property," and "[a]ll cash proceeds" from this sale "will first be applied to the payment of all outstanding obligations then owed to the Purchasers under the Notes."  *Id.*, Ex. A ¶ 7(b).

Furthermore, the SPA specifies that "[t]he Units, the Notes, the Ordinary Shares and the Conversion Shares shall collectively be referred to as the 'Securities,'" *id.* at 2, and that the "Purchaser agrees to the imprinting of a legend on all certificates representing the Securities" to

the following effect:  "THE SECURITIES WHICH ARE REPRESENTED HEREBY HAVE

NOT BEEN THE SUBJECT OF REGISTRATION UNDER THE SECURITIES ACT OF 1933,

AS AMENDED," *id.* ¶ 10(b).

With respect to Exhibits A and B, Bongiorno swears that he "had never seen this

document before [his] attorneys sent it to him with the Reply Memorandum" and that "[t]his

document is not in [his] files, [he] was never given this document by the defendants, and [he]

never signed same."  Dkt. No. 103-1 ¶ 4.  In Defendants' declaration in response, Baquet first

notes that Bongiorno does not deny that Exhibits A and B accurately describe the terms of the

investments, including that the notes were convertible, that he participated in these private

placements, or that he received common stock in connection with the investments alongside

convertible promissory notes.  Dkt. No. 105 ¶¶ 2, 4-5.  Baquet also states that all investors in the

August 2008 transaction received and were required to sign the SPA in Exhibit B.  *Id.* ¶ 5.  In

addition, at oral argument, Plaintiffs explicitly represented that the promissory note for the 2008

loan was *not* convertible and did not share the terms of that note, rebutting Defendants'

contention that the Exhibit B outlined the terms of the 2008 loan.  *See* Transcript of September

10, 2021 Hearing ("Hr'g Tr."), 15:12-20, 29:15-23.  The Court relies on that representation,

which will judicially estop Plaintiffs from later claiming otherwise.

Exhibit C is allegedly a copy of the type of promissory note issued to Bongiorno by

SDRI, Inc. on August 29, 2008 for his $101,000 investment.  Dkt. No. 96 ¶ 3; 96-3.  The note

reflects that it was included in Units sold by the company in a private offering pursuant to a

Securities Purchase Agreement, Dkt. No. 96-3 at 2, and was convertible into Ordinary Shares, *id.*

at 6.  It also provides that the company "will use its reasonable best efforts to secure its payment

obligations under the Notes, by obtaining a first lien on the Brenon Property."  *Id.* at 2.  The first

page of the note provides: "NEITHER THIS NOTE NOR THE SECURITIES ISSUABLE UPON CONVERSION OF THIS NOTE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION . . . ." *Id.* at 1.

With respect to Exhibit C, Bongiorno states that it "is a promissory note that is NOT one of the three promissory notes for which [he] is suing." Dkt. No. 103-1 ¶ 6. He highlights how Exhibit C is for $100,000 while the promissory note alleged in the Amended Complaint is for $101,000. *Id.* He also notes that his signature does not appear in the document. *Id.* Regarding the discrepancy between the $101,000 and $100,000 figures, Baquet explains that while the offering price was $50,500 per Unit (or $101,000 for two Units), the Unit was comprised of a $50,000 promissory note and 50,000 ordinary shares of SDRI stock. Dkt. No. 105 ¶ 6. Thus, both the $101,000 and the $100,000 figures are correct and can be reconciled. Baquet also attaches a copy of the note with the company signature page that has Bongiorno's name typed at the bottom with the notation: "Principal Amount of This Note: U.S. $100,000." Dkt. No. 105-1, at 15.

Exhibit D is allegedly a copy of an April 24, 2009 supplement executed by Bongiorno amending and spelling out the terms of his $101,000 investment as part of a February 2009 SDRI private placement. Dkt. No. 96 ¶ 3; 96-4. This document includes a signature above Bongiorno's name. Dkt. No. 96-4, at 4. Baquet, who is Executive Chairman of SDRI and who submits the records, states that he does not have a copy of the promissory note related to this investment but states that it has essentially the same format as the promissory note in Exhibit C. Dkt. No. 96 ¶ 3. Baquet declares that the promissory notes issued to Bongiorno in 2008 and 2009 were made pursuant to private placements offered by SDRI and that in each case the private placement provided the investor with shares of stock plus a promissory note convertible

into common stock of the company. *Id.* ¶ 4. Additionally, in the case of the April 2009 amendment, investors received warrants in SDRI. *Id.*

Bongiorno finds Exhibit D "most troubling" as he has never seen the document, "it is not clear to [him] what transaction it allegedly is referring to," and the signature on it is not his. Dkt. No. 103-1 ¶ 7. In response to the allegation that the signature on Exhibit D does not belong to Bongiorno, Baquet points out that the page with a signature has a facsimile trail indicating it was sent from Bay Street Med, which Baquet states was Bongiorno's office, on April 24, 2009 and that the facsimile number was Bongiorno's number. Dkt. No. 105 ¶ 7. Baquet also attaches an additional signature page, which shows that it was sent from Bongiorno's office and bears the office address for Bongiorno as well as his social security number. *Id.* ¶ 8.

With respect to Exhibits A, B, and C, Defendants do not deny that the exhibits are not copies of the precise documents given to Bongiorno. *See* Hr'g Tr. 29:5-14. They cannot locate those documents; these exhibits are copies of the types of documents given to Bongiorno and upon which he relies. *See id.* For their part, although the Amended Complaint purports to quote from the 2008 promissory note, Am. Compl. ¶ 80, Plaintiffs maintained at argument that they no longer retain the 2008 note upon which they are suing.[8] *See* Hr'g Tr. 17:10-12.

On a motion to dismiss, "[t]wo separate rules permit the Court to consider documents that are not contained within the four corners of the complaint." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382 (S.D.N.Y. 2020) (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007)). "First, under Federal Rule of Evidence Rule 201, the Court may take judicial notice of a fact that is 'not subject to reasonable dispute because it (1) is generally

---

[8] Plaintiffs have not furnished copies of the 2008 and 2009 promissory notes referenced in their Amended Complaint, even though Bongiorno declares that he "had been very diligent in getting and preserving all the documents the defendants presented to [him]." Dkt. No. 103-1 ¶ 4. .

known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Id.* (quoting Fed. R. Evid. 201). "Second, relying on Federal Rule of Civil Procedure Rule 10(c), the Second Circuit has long held that a complaint 'is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference,' and that a court may consider documents incorporated in a complaint by reference on a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) without converting it to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56." *Id.* (quoting *Cortec Indus., Inv. v. Sum Holdings,* 949 F.2d 42, 47 (2d Cir. 1991)).

As a necessary corollary to the foregoing principles, a plaintiff cannot avoid judicial consideration of a document upon which it bases its complaint by the expedient refusal to attach it to the pleading or refer to it *in haec verba*. "'[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and is integral to the complaint,' the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (second alteration in original) (quoting *Cortec*, 949 F.2d at 47-48)). "Where a plaintiff has 'reli[ed] on the terms and effect of a document in drafting the complaint,' and that document is thus 'integral to the complaint,' we may consider its contents even if it is not formally incorporated by reference." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005) (alteration in original) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) ("A necessary prerequisite for taking into account materials extraneous to the complaint is that the plaintiff *rely*

on the terms and effect of the document in drafting the complaint; mere notice or possession is

not enough." (internal quotation marks omitted)). "In most instances where this exception is

recognized, the incorporated material is a contract or other legal document containing obligations

upon which the plaintiff's complaint stands or falls, but which for some reason—usually because

the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was

not attached to the complaint. The exception thus prevents plaintiffs from generating complaints

invulnerable to Rule 12(b)(6) simply by clever drafting." *Glob. Networks Commc'ns, Inc. v. City

of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (citation omitted). In fraud cases, this principle

applies to documents alleged to contain the false and misleading statement. *See Roth v.

Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (stating that the incorporation-by-reference doctrine

"has its greatest applicability in cases alleging fraud"). A clever plaintiff cannot avoid the

court's review of a communication "as a whole" as required by the law by quoting only a portion

of the communication and omitting the remainder. *See Yak v. Bank Brussels Lambert*, 252 F.3d

127, 130 (2d Cir. 2001) ("We have held that where a plaintiff contends an offering prospectus

contains materials misrepresentations, the court may consider the prospectus as a whole despite

the fact that the plaintiff did not annex the prospectus as an exhibit to its complaint." (citing *I.

Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991)).

        "[E]ven if a document is 'integral' to the complaint," however, a court may not consider

it on a motion to dismiss if a "dispute exists regarding the authenticity or accuracy of the

document."[9] *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting

---

[9] Courts in this Circuit have "interpreted strictly" the requirement that there be no dispute about
the authenticity and accuracy of extrinsic documents integral to the complaint: "even implicit,
conclusory, contradictory, or implausible objections to the authenticity or accuracy of a
document render consideration impermissible." *UPS Store, Inc. v. Hagan*, 99 F. Supp. 3d 426,
435 (S.D.N.Y. 2015) (quoting *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 221 (N.D.N.Y. 2014));

*Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)); *see also Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 224 (S.D.N.Y. 2018) ("[E]videntiary uncertainty is a primary reason why courts have refused to consider such submissions at the pleadings stage."); *HSM Holdings*, 2021 WL 918556, at *2 n.1. "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner*, 463 F.3d at 134.

Exhibits C and D are not properly considered on this motion to dismiss, without converting it to a motion for summary judgment, as there are material disputed issues concerning whether these describe the terms of the notes that are incorporated by reference. If the Court accepts Bongiorno's declaration as true for purposes of this motion, as it must, Exhibit C "is a promissory note that is NOT one of the three promissory notes for which [he] is suing." Dkt. No. 103-1 ¶ 6. At oral argument, Bongiorno's lawyer explained that Bongiorno's declaration should be understood expansively and not literally—Exhibit C is not an example of the type of the note he is suing on. *See* Hr'g Tr. 15:1-20. Bongiorno's declaration that Exhibit C is not the type of note upon which he is suing precludes it from consideration on a motion to dismiss. *See*

---

*see also Savides v. United Healthcare Servs., Inc.*, 2019 WL 1173008, at *2 (S.D.N.Y. Mar. 13, 2019) (collecting cases). Though a plaintiff "may eventually face an impenetrable obstacle once the actual, complete [documents] are produced in discovery, [its] challenge to the authenticity of the documents put in by [defendants]—even if 'dubious' or 'questionable'—precludes the Court from considering" them on a motion to dismiss. *Mbody Minimally Invasive Surgery, P.C. v. United Healthcare Ins. Co.*, 2016 WL 4382709, at *7 (S.D.N.Y. Aug. 16, 2016) (collecting cases). Moreover, there are limits to the ability of a plaintiff to cite (without attaching) a document and then level false assertions when its adversary seeks to put them before the Court on a motion to dismiss. Even if a plaintiff's assertion prevents the documents from being cognizable on a motion to dismiss, the Court retains power to tailor the discovery process to permit defendant to challenge the plaintiff's assertion of lack of authenticity and, should it turn out that plaintiff's assertion always lacked evidentiary support, the plaintiff may be subject to sanctions. *See, e.g.*, Fed. R. Civ. P. 11; *Shafii v. Brit. Airways, PLC*, 83 F.3d 566, 571 (2d Cir. 1996) ("A district court may, in its discretion, impose sanctions against litigants who abuse the judicial process."); *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012) ("A district court has broad latitude to determine the scope of discovery and to manage the discovery process.").

*Nicosia*, 834 F.3d at 235 (finding disputed relevance as a reason not to consider a document on a motion to dismiss); *Structured Asset Sales, LLC v. Sheeran*, 2021 WL 1199495, at *10 (S.D.N.Y. Mar. 30, 2021) ("Where, as here, there are material disputes of fact regarding the relevance of a document, the Court should not rely on that document as a basis for dismissal.").

Similarly, Bongiorno also disputes that Exhibit D is a copy of a supplement outlining the terms of Bongiorno's 2009 loan to SDRI.  He swears under oath that "it is not clear to [him] what transaction it allegedly is referring to."  Dkt. No. 103-1 ¶ 7.  Bongiorno also challenges the authenticity of the document, alleging that the signature on the document does not belong to him. *Id.*  A plaintiff's failure to understand a document does not automatically mean that it is not relevant to a complaint; instead, the key question is whether the plaintiff relied on the *terms* and *effects* of that document in drafting the complaint.  *See Chambers*, 282 F.3d at 153.  However, taking Bongiorno's declaration as true, there is an issue of fact as to whether Exhibit D describes the precise terms of the 2009 note Bongiorno purchased.  *Cf. Anwar v. Fairfield Greenwich Ltd.*, 831 F. Supp. 2d 787, 793 (S.D.N.Y. 2011) (finding that "correlation alone" between an extrinsic document and one that is integral to the complaint "is not enough to render [it] integral to the Complaint").

Exhibit B also is not cognizable on the motion to dismiss.  Bongiorno declares that he has never seen the document before and that he was not given it by Defendants.  His lawyer represented at oral argument that Exhibit B does not describe the terms of the note upon which he is suing.  Plaintiffs represented at argument that the 2008 promissory note is not convertible. The SPA in Exhibit B contained the terms of a private placement offering in which each Unit comprised 50,000 Ordinary Shares and a $50,000 *convertible* promissory note.  Because

Plaintiffs represent that the 2008 promissory note is not convertible, Exhibit B's relevance is disputed, and it will therefore not be considered on the motion to dismiss.

Exhibit A—the cover page and excerpts of a 2007 private placement memorandum—present a closer question. As an initial matter, Exhibit A is integral to the Amended Complaint because the 2007 loan, as well as the stock investment, is alleged to be central to Defendants' scheme to defraud Bongiorno. Am. Compl. ¶¶ 34-35. According to the Amended Complaint, in or about 2007, Baquet and Delape—"[r]efreshing the well-worn play book of Floridian swampland confidence men and storied Florida land scams"—invited Bongiorno and others on an all-expenses paid trip to Panama to pitch a "shell investment opportunity" for bridge loans and participation in an IPO for SDRI, Inc. *Id.* ¶ 25. In that same year, Giordano, Delape, and Baquet asked Bongiorno to make a $50,000 bridge loan, which SDRI, Inc. quickly repaid. *Id.* ¶ 34. Plaintiffs allege: "It is not uncommon in confidence schemes for the mark to receive money back from a first loan or a first investment. This is followed with subsequent *asks* shortly thereafter for a greater amount to be borrowed or invested because the mark has been lulled into a false sense of confidence that he will be repaid." *Id.* ¶ 35. "[A]lmost simultaneously after repayment, [Bongiorno] was bamboozled into providing yet another so called 'bridge loan' of $101,000," which is one of the loans Bongiorno is suing over. *Id.* ¶ 34. Plaintiffs cannot evade review of the April 2007 private placement memorandum in connection with their Amended Complaint by the expedient of not mentioning the document in so many words. *See Yak*, 252 F.3d at 131 ("Carefully avoiding all mention of [certain agreements] does not make them any less integral to [plaintiff's] complaint."). The Amended Complaint alleges that Bongiorno's investment in 2007 was a critical part of the alleged fraudulent scheme; therefore, Exhibit A is integral to the Amended Complaint.

Plaintiffs object to the incorporation of Exhibit A; Bongiorno swears that the document was never seen by him, is not in his files, was not given to him by Defendants, and is unsigned. Dkt. No. 103-1 ¶¶ 4-5.  Exhibit A is a copy of a Subscription Agreement; the cover page contains blanks for the name of the Subscriber and the Copy Number, indicating that it is not an original of a Subscription Agreement given to an investor.  With that in mind, the Bongiorno declaration still only goes that far.  Importantly, unlike with Exhibits B, C, and D, Bongiorno does not claim (either in his declaration or through counsel at oral argument) that Exhibit A is irrelevant to the allegations in the Amended Complaint.  Further, Bongiorno does not claim that the documents are inaccurate or inauthentic copies of the documents for the offerings pursuant to which he acquired SDRI stock in 2007, and extended a loan to SDRI in that same year.  The Court thus considers Exhibit A for those purposes.  *See Structured Asset Sales*, 2021 WL 1199495, at *9 ("Because there is no dispute regarding the authenticity, accuracy, or relevance of that provision, or the larger document in which it is contained, the Court may consider it."  (internal quotation marks omitted)); *cf. Anwar*, 831 F. Supp. 2d at 793 ("[T]he issues raised by the [plaintiffs]—that the Purchase Letter governs only part of the money they invested and is not signed by both of the [plaintiffs]—do not disturb the relevance of the Purchase Letter as an example of the Form Contract.").  The Court denies the motion to strike with respect to Exhibit A.  Yet, the issue is somewhat academic as Exhibit A does not bear on the Court's decision.

In addition, after oral argument on this motion, Plaintiffs' counsel submitted copies of the 2007 promissory note and the 2014 promissory note.  Dkt. No. 115.  Both documents are integral to the Amended Complaint:  the 2007 promissory note for the reasons already given regarding Exhibit A; and the 2014 promissory note because it is one of the notes on which Plaintiffs are suing.  Defendants do not challenge the relevance, accuracy, or authenticity of these

documents.[10]  Dkt. No. 116.  These documents are therefore incorporated into the Amended

Complaint by reference and may be considered on the motion to dismiss.

## III.    Defendants' Motion to Dismiss

The Court turns next to the substance of Defendants' motion to dismiss Plaintiffs'

Amended Complaint, starting with the RICO claim—Plaintiffs' only claim arising under federal

law.

### A.       The RICO Claim

Defendants move to dismiss Plaintiffs' RICO claim on four principal bases:  (1) it is

barred by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *see* 18 U.S.C. §

1964(c); (2) it fails to plead mail and wire fraud with particularity; (3) it fails to properly allege

continuity; and (4) it is barred by the applicable statute of limitations.  The Court agrees with

Defendants that the claim is barred by the PSLRA and fails to plead mail and wire fraud with

particularity.  Accordingly, the Court need not reach Defendants' remaining arguments.

#### 1.       The PSLRA Bar

Section 107 of the Private Securities Litigation Reform Act (the "RICO Amendment")

amended the RICO statutes to provide that "no person may rely upon any conduct that would

have been actionable as fraud in the purchase or sale of securities to establish a violation of

section 1962."  18 U.S.C. § 1964(c); *see also MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651

F.3d 268, 273-74 (2d Cir. 2011).  In other words, the RICO Amendment "bar[s] civil RICO

claims based on allegations of securities fraud." *MLSMK Inv. Co.*, 651 F.3d at 274.  "[T]he

---

[10] Defendants, however, contend that the new materials were improperly submitted "in connection with a motion already *sub judice* and after oral argument" and that "[t]he materials [were] also attached to an attorney letter which is not evidentiary."  Dkt. No. 116.  The Court accepts the materials submitted by Plaintiffs in the exercise of its discretion, but even if the Court did not consider the submissions, it would nonetheless arrive at the same result.

purpose of the bar [i]s to prevent litigants from using artful pleading to boot-strap securities

fraud cases into RICO cases, with their threat of treble damages." *Id.* (internal quotation marks

omitted).

"The scope of the RICO Amendment is broad. It bars *any* claim that is actionable as

fraud in the purchase or sale of securities, even in situations where a plaintiff lacks standing or is

otherwise precluded from asserting a valid claim under the securities laws." *Zohar CDO 2003-1,*

*Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634, 643 (S.D.N.Y. 2017); *see also MLSMK*

*Inv. Co.*, 651 F.3d at 278 ("[T]he RICO Amendment is worded broadly . . . ."). "[I]f the alleged

conduct could form the basis of a securities fraud claim against *any* party—be it against, or on

behalf of, the plaintiff, defendants or a non-party—it may not be fashioned as a civil RICO

claim." *Zohar*, 286 F. Supp. 3d at 644; *see also MLSMK Inv. Co.*, 651 F.3d at 277 ("[S]ection

107 of the PSLRA bars civil RICO claims alleging predicate acts of securities fraud, even where

a plaintiff cannot itself pursue a securities fraud action against the defendant."); *Thomas H. Lee*

*Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 283 (S.D.N.Y.

2009) ("[T]he RICO Amendment bars claims based on conduct that could be actionable under

the securities laws even when the plaintiff, himself, cannot bring a cause of action under the

securities laws.").

The RICO Amendment "was intended not simply 'to eliminate securities fraud as a

predicate offense in a civil RICO action,' but also to prevent a plaintiff from 'plead[ing] other

specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses

are based on conduct that would have been actionable as securities fraud.'" *Monterey Bay Mil.*

*Hous., LLC v. Ambac Assurance Corp.*, 2021 WL 1226984, at *27 (S.D.N.Y. Mar. 31, 2021)

(alteration in original) (quoting *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321,

327 (3d Cir. 1999)); *see* also *MLSMK Inv. Co.*, 651 F.3d at 278-79 (same); *Fezzani v. Bear, Stearns & Co.*, 2005 WL 500377, at *3 (S.D.N.Y. Mar. 2, 2005) ("The amendment also bars recasting conduct that would be actionable securities fraud as mail or wire fraud.").  "Thus, [t]o determine whether an alleged predicate act in a civil RICO claim is in connection with the purchase or sale of securities and is therefore barred by [the RICO Amendment], the Court must focus its analysis on whether the conduct pled as the predicate offenses is 'actionable' as securities fraud." *Zohar*, 286 F. Supp. 3d at 644 (internal quotation marks omitted and alterations in original).

Defendants argue that the RICO claim is barred by the PSLRA amendment because "the gravamen of the RICO claim is alleged misrepresentations made in connection with the purchase and sale of securities."[11]  Dkt. No. 67 at 11.  They assert that the promissory notes that form the basis of the RICO claim were part of Bongiorno's investments in a private placement of Units offered by SDRI that included a convertible promissory note and shares of SDRI common stock (and, in the case of the third promissory note, warrants to purchase stock in SDRI).  Dkt. No. 95 at 3.  According to Defendants, these transactions cannot be considered anything other than

---

[11] Defendants also point out that "identical facts were originally pled as securities law violations" and that "[t]he complaint was changed to instead plead mail and wire fraud when plaintiff's counsel was apprised of the PSLRA amendments in defendants' Rule 11 sanctions motion served upon plaintiff's counsel."  Dkt. No. 67 at 11 n.17.  The original complaint in this matter alleged claims under the Securities Exchange Act of 1934 as well as under RICO.  Dkt. No. 4. Plaintiffs' original assertion of securities claims, however, is not itself fatal to the viability of their RICO claim.  "Second Circuit law permits a plaintiff to omit in a subsequent pleading allegations previously made, even where the omission reflects a plaintiff's effort to avoid dismissal." *Ambac Assurance*, 2021 WL 1226984, at *30; *see also Dluhos v. Floating & Abandoned Vessel, Known as New York*, 162 F.3d 63, 68 (2d Cir. 1998) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks and alteration omitted)); *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 600-01 (S.D.N.Y. 2013) (discussing that original complaint may constitute an admission for purposes of trial without being dispositive on a Rule 12(b)(6) motion).

securities transactions.  *Id.*  They further contend that, even if the promissory notes were

analyzed in isolation separately from the acquisition of the Units pursuant to which Bongiorno

obtained the notes, the notes would still be considered securities.  *Id.* at 4-7.  Defendants contend

that since the essence of Plaintiffs' RICO claim is that Defendants made misrepresentations in

connection with securities transactions, the claim cannot survive the PSLRA bar.  Finally, at

argument, Defendants contended that the allegations of the Complaint themselves do not support

the assertion that the notes were other than securities.

Plaintiffs' sole argument in response is that the RICO claim is not barred by the PSLRA

because the promissory notes at issue are not securities. Dkt. No. 89 at 3-7.  Plaintiffs claim that

the notes were short term (and that the first and second notes were due six months from issuance)

and that, as a result, they cannot be securities as a matter of law.  *Id.* at 4-5.  Plaintiffs also argue

that the fourth predicate act, which involves the "theft of . . . Bongiorno's stock certificates years

after he acquired the stock," is not barred by the PSLRA amendment because "[t]here is no

allegation that this theft involved fraud in the purchase of a security."  *Id.* at 4.

To determine whether the promissory notes at issue are securities, the Court applies the

"family resemblance" test adopted by the Supreme Court in *Reves v. Ernst & Young*, 494 U.S.

56, 67 (1990).  *See also Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 811 (2d Cir. 1994);

*Banco Espanol de Credito v. Security Pac. Nat'l Bank*, 973 F.2d 51, 55 (2d Cir. 1992).  Under

this test, there is "a presumption that every note is a security."  *Reves*, 494 U.S. at 65.  "[T]hat

presumption may be rebutted only by a showing that the note bears a strong resemblance . . . to

one of the enumerated categories of instrument" that are *not* securities.[12]  *Id.* at 67.  To rebut the

---

[12] The categories of notes that are *not* securities were identified by Judge Friendly in *Exchange Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126 (2d Cir. 1976), and adopted by the Supreme Court in *Reves*.  *See* 494 U.S. at 65.  The categories of non-securities notes include:

presumption, the Court examines whether the note in question bears a "strong family resemblance," *id.* at 64, to one of the types of notes that are not considered securities.  In doing so, the Court is guided by the four factors set forth in *Reves*: (1) "the motivations of what would prompt a reasonable seller and buyer to enter into [the transaction]" and whether "the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate" or by contrast "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose"; (2) "the 'plan of distribution' of the instrument to determine whether it is an instrument in which there is 'common trading for speculation or investment'"; (3) "the reasonable expectations of the investing public"; and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary," *id.* at 66 (citations omitted).  In addition, "[i]f an instrument is not sufficiently similar to an item on the list, the decision whether another category should be added is to be made by examining the same factors."  *Id.* at 67.

Plaintiffs argue that the presumption that the notes are securities does not apply because each of the notes has a term of less than nine months and because the three notes at issue

---

"the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)" as well as "notes evidencing loans by commercial banks for current operations."  *Id.* at 65 (first quoting *Exchange Nat'l Bank*, 544 F.2d at 1138; then quoting *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d Cir. 1984)).

resemble a "short-term note secured by a lien on a small business or some of its assets," one of

the recognized categories of non-securities notes.  Dkt. No. 89 at 4 (quoting *Reves*, 494 U.S. at

65).  The Court in *Reves* noted "[t]he Second Circuit's version of the family resemblance test

provided that only notes *with a term of more than nine months* are presumed to be 'securities'"

and declined to express a "view on how that exception might affect the presumption that a note is

a 'security.'"  *Reves*, 494 U.S. at 65 n.3; *see also Banco Espanol de Credito*, 973 F.2d at 58

(Oakes, C.J., dissenting) (the Supreme Court "refused to express any view on whether the

[Securities Exchange Act of 1934's] statutory exception for notes with a maturity of nine months

or less affected the presumption that every note is a security" (citing *Reves*, 494 U.S. at 65 n.3)).

Post-*Reves*, courts in this District  have stated that the presumption applies to notes with terms

exceeding nine months without squarely addressing whether the presumption also applies to

shorter-term notes.[13]  The Second Circuit has not addressed the issue.

Even assuming the presumption does not apply to notes with a term of nine months or

less, Plaintiffs' pleading falls short of the allegation that any of the notes at issue have a term of

nine months or less.  The Amended Complaint does not plead that the notes were due within nine

months but only that they would be repaid in nine months, i.e., that they could and would be

discharged and satisfied within that time.  Am. Compl. ¶¶ 72 ("The *representation* by [Baquet]

was that the note would be *repaid in six months* . . . ."), 73 ("Based on the *representations* made

as well as those contained in the note . . . that the land would be sold or mortgaged so that the

note would be *paid off in six months* . . . ."), 81 ("Based on the *representations* in the telephone

---

[13] *See, e.g.*, *Schentag v. Nebgen*, 2018 WL 3104092, at *8 (S.D.N.Y. June 21, 2018); *United States v. Bergstein*, 2018 WL 2417845, at *3 (S.D.N.Y. May 29, 2018); *Fragin v. Mezei*, 2012 WL 3613813, at *8 (S.D.N.Y. Aug. 22, 2012); *Benedict v. Amaducci*, 1995 WL 413206, at *9 (S.D.N.Y. July 12, 1995); *Nat'l Bank of Yugoslavia v. Drexel Burnham Lambert, Inc.*, 768 F. Supp. 1010, 1014 (S.D.N.Y. 1991).

conversation . . . that the land would be sold or mortgaged so that the note would be *paid off in six months* . . . .") (emphases added).[14]  A representation about when a debt would be satisfied, however, is far different from an allegation about when it was due.  There are all kinds of reasons why—if the instrument permits it—a debtor may want to prepay and discharge a debt, including to avoid the accumulation of interest charges.  But the fact that a debt instrument permits the debtor to satisfy its obligation within nine months and that the debtor intends to do so is far different from an allegation that the debt has a term of nine months or less.  The term of an instrument refers to when payment on the obligation is *due*, not to when it will be made.  *See Reves*, 494 U.S. at 77 (Rehnquist, C.J., concurring in part and dissenting in part) (finding that, when the Securities Exchange Act of 1934 was passed, "[c]ontemporaneous editions of legal dictionaries defined 'maturity' as '[t]he time when a . . . note becomes *due*'" (second alteration in original) (emphasis added) (quoting Black's Law Dictionary 1170 (3d ed. 1933)).  The assertion that Defendants represented the debt would be discharged within nine months thus establishes no more than that Defendants expected to pay down the note within that time period. It does not establish that the debt was due within nine months.  Indeed, the well-pled allegations

---

[14] Plaintiffs contend in briefing that "the first and second notes expressly stated they were due in six months from issuance."  Dkt. No. 89 at 4.  However, a party may not amend its pleading through a brief in opposition to a motion to dismiss.  *See United States ex rel. Foreman v. AECOM*, 454 F. Supp. 3d 254, 268 n.4 (S.D.N.Y. 2020) ("It 'is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss.'" (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989))).  Tellingly, although the Amended Complaint also alleges that the third promissory note "stated . . . that the land would be sold or mortgaged so that the note would be *paid off in six months*," Am. Compl. ¶ 89 (emphasis added), no such statement is included in the copy of the third promissory note incorporated to the Amended Complaint by reference, Dkt. No. 115.  Therefore, the document's terms will control. *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 598 B.R. 102, 115 (S.D.N.Y. 2019) ("Where the plaintiff's allegations are contradicted by a document that the complaint incorporates by reference, the document controls." (quoting *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 215 (S.D.N.Y. 2008))).

of the Amended Complaint accepted as true suggest the contrary.  Defendants allege that

Bongiorno knew as late as 2018, that the promissory notes tendered in 2008, 2009, and 2014 had

not been paid and does not allege that Bongiorno did anything to demand they be paid.  Am.

Compl. ¶¶ 75, 84, 91.  The inference is plain that the term of the notes had not yet run.

Plaintiffs have not pleaded additional facts sufficient to rebut the presumption that the

three promissory notes underlying their RICO claim are securities.

The first *Reves* factor asks "whether the motivations are investment (suggesting a

security) or commercial or consumer (suggesting a non-security)."  *Pollack*, 27 F.3d at 812.  The

Amended Complaint affirmatively alleges facts that would suggest the motivations on both sides

were investment-related.  It does not allege facts suggesting that SDRI was motivated by

commercial interests as would be the case, for example, when the note was exchanged to obtain a

particular asset.  *See Intelligent Digit. Sys., LLC v. Visual Mgmt. Sys., Inc.*, 683 F. Supp. 2d 278,

284 (E.D.N.Y. 2010) (finding a commercial motivation where the transaction was "best

described as the sale of technology from one business to another for a lump sum").  Nor does it

allege that the notes were issued in connection with a commercial transaction such as a credit

agreement intended to assist the debtor with loan repayment and the paying of a dividend.  *See*

*Kirschner as Tr. of Millennium Lender Claim Tr. v. JPMorgan Chase Bank, N.A.*, 2020 WL

2614765, at *8 (S.D.N.Y. May 22, 2020).  The Amended Complaint does not allege that the note

was in the nature of a consumer transaction.  On Bongiorno's side, there is no claim that

Bongiorno was in the business of extending financing or that any of the "loans" were extended in

connection with the purchase of a specific asset or in connection with a specific transaction.

Rather, the Amended Complaint alleges that the loan associated with the second promissory note provided money for SDRI, Inc. "as operating capital."[15]  Am. Compl. ¶ 79.  The proceeds were not limited to use "to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose."  *Reves*, 494 U.S. at 66.  This fact is consistent with the notion that SDRI's purpose in accepting money from Bongiorno and Bongiorno's purpose in extending the loan was investment-related and reflects SDRI's need "to raise money for the general use of a business enterprise or to finance substantial investments."  *Id.*  The Amended Complaint also alleges that at least fifty other similar promissory notes were issued in 2008 and 2009, Am. Compl. ¶¶ 95-96, suggesting that Bongiorno's notes from those years "were part of a larger financing operation" in which "the proceeds from the loan[s] were the equivalent of equity capital."  *Priv. Corp. Advisors, Inc. v. Heard*, 1995 WL 66647, at *8 (S.D.N.Y. Feb. 17, 1995).  This too indicates an investment motivation by SDRI.  And, for his part, Bongiorno was taking a risk on an enterprise, albeit a risk that was qualified and mitigated by the collateral that backed the instruments. Indeed, the language of the Amended Complaint as much as admits that Bongiorno's motive was investment-related.  The Amended Complaint alleges that Bongiorno made the loan based on the assurances from Giordano (Bongiorno's investment advisor), Baquet, and Delape "that the *investment* was good and secured by land."  Am. Compl. ¶ 34 (emphasis added); *cf. Pollack*, 27 F.3d at 813 (finding the buyers' "motivation as not even a close question" where "[t]he instruments were obtained . . . by their investment adviser as part of their investment

---

[15] The Amended Complaint alleges that the loan associated with the first promissory note was needed "to 'keep SDRI, Inc.' afloat."  *Id.* ¶ 72.  As discussed below, the allegation that a company raising funds needs them to keep operating cannot answer the question whether those funds are being raised through the issuance of securities or through a commercial loan not regulated by the securities laws.

portfolios"); *Kirschner*, 2020 WL 2614765, at *8 (fact that buyer's motivations were investment supported conclusion notes were securities).  In discussing the three promissory notes, Plaintiffs allege that certain information was not revealed to Bongiorno and the "other *investors*."  *Id.* ¶¶ 76, 82, 90 (emphasis added).  Plaintiffs also allege that Bongiorno insisted that Baquet provide him with the third promissory note "to protect his *investment*."  *Id.* ¶ 87 (emphasis added).

The second *Reves* factor is the plan of distribution.  "Generally, if notes are offered and sold to a broad segment of the public or are instruments that are commonly traded for speculation or investment, then this factor suggests that the notes are securities."  *Fragin v. Mezei*, 2012 WL 3613813, at *10 (S.D.N.Y. Aug. 22, 2012) (citing *Reves*, 494 U.S. at 66).  However, "restrictions on the marketing of certain loan participations strongly suggests" that the instrument is not a security.  *Pollack*, 27 F.3d at 813.  For instance, if "only institutional and corporate entities were solicited, detailed individualized presentations were made to potential purchasers and resales were prohibited without the express written permission of the broker," the plan of distribution suggests that the instrument is not a security.  *Id.* (citing *Banco Espanol de Credito*, 973 F.2d at 55).  Here, there are no allegations that the loans were one-offs or were offered uniquely to Plaintiffs or to some select group of "highly sophisticated commercial entities."  *Id.*  There also are no allegations here, as there were in *Kirschner*, that the notes can only be assigned with the consent of the lender, and cannot be assigned to a natural person.  *Kirschner*, 2020 WL 2614765, at *8.  To the contrary, the Amended Complaint alleges that "[i]n 2008-2009, the defendants, Baquet and Delape, issued similar promissory notes to other lenders."  *Id.* ¶ 95; *see id.* ¶ 96 (alleging that at least fifty other loans were secured).  There are no allegations that SDRI prohibited Plaintiffs from reselling the notes or demanded consent.  Indeed, the 2014 promissory note—which is incorporated by reference—includes no such limitation on transfer or resale.  The

plan of distribution thus does not rebut the conclusion that the notes are securities but to the contrary supports it.

Third, *Reves* directs courts to look to the reasonable expectations of the investing public. "[T]his factor is an objective test that turns on whether a reasonable purchaser would have perceived the Notes to be an investment." *Fragin*, 2012 WL 3613813, at *10. "Courts consider whether actual purchasers reasonably believed the Securities Acts protected them." *United States v. Bergstein*, 2018 WL 2417845, at *4 (S.D.N.Y. May 29, 2018). The Amended Complaint alleges that Baquet and Delape invited Bongiorno and others on an all-expenses paid trip to Panama to pitch an "investment opportunity," which included "'bridge' loans to SDRI, Inc. and participation in an initial public offering." Am. Compl. ¶ 25. Because the loans were pitched as investments, "it would be reasonable for a prospective purchaser to take the [seller] at its word." *Reves*, 494 U.S. at 69. There are no allegations that the offering memorandum for the notes described the instruments exclusively as "loans" and did not refer to the securities laws. *Cf. Kirschner*, 2020 WL 2614765, at *9 (credit agreement repeatedly and consistently referred to instruments as loans and to purchasers of instruments as lenders). Indeed, from the Amended Complaint's allegations that Bongiorno consulted his investment advisor and from its references to the instruments as an investment, the most plausible inference is that Bongiorno reasonably believed he would be protected by the federal securities laws.

Finally, Plaintiffs do not allege any "risk-reducing factors outside of the federal securities laws." *Schentag v. Nebgen*, 2018 WL 3104092, at *10 (S.D.N.Y. June 21, 2018); *see also Bergstein*, 2018 WL 2417845, at *4 ("The final *Reves* factor centers on whether another applicable risk-reducing factor renders the application of the Securities Acts unnecessary."). This too suggests that the promissory notes are securities.

The thrust of Plaintiffs' argument is that the promissory notes were fixed rate instruments issued by a small business in need in exchange for a fixed interest rate and are akin to a "short-term note secured by a lien on a small business or some of its assets."  *Reves*, 494 U.S. at 65. The Second Circuit has held, however, that the fact that an instrument bears a fixed rate of interest does not take it outside the scope of the federal securities laws, *see Pollack*, 27 F.3d at 813, and it would be a rare business indeed that raised funds—either through securities or a loan—without needing the funds.  The fact that an instrument is secured by collateral does not prevent it from being a security.  There are numerous securities that offer investors some protection in the form of collateral.  *See, e.g.*, *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 710 n.2 (2d Cir. 2011) (stating that collateralized debt obligations ("CDOs") "are diversified collections of bonds that are divided into various risk groups and then sold to investors as securities." (quoting *Slayton v. Am. Express Co.*, 460 F.3d 215, 219 n.3 (2d Cir.2006))); *U.S. S.E.C. v. Stoker*, 865 F. Supp. 2d 457, 458-59 (S.D.N.Y. 2012) (finding that securities fraud complaint stated a claim for violations of the Securities Act of 1933 for conduct in connection with CDOs—"debt securities collateralized by fixed income obligations, such as residential mortgage-backed securities").  Investors take a risk both on the enterprise and on the collateral. Finally, the claim that SDRI was small does not mean that it could not issue securities or that persons who funded its operations were deprived of the protection of the federal securities laws. An important purpose of the federal securities laws is to protect investors in penny stocks and instruments issued by small companies.  *See* Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub. L. No. 101-429, 104 Stat. 931; *United States Sec. & Exch. Comm'n v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 238 (S.D.N.Y. 2019), *aff'd*, 982 F.3d 68 (2d Cir. 2020) ("The Penny Stock Reform Act of 1990, for example, identified as problems with

the penny stock markets a serious lack of adequate information concerning price and volume of penny stock transactions, involvement by individuals banned from the securities markets in roles such as promoters or consultants, and the use of shell corporations to facilitate market manipulation schemes." (internal quotation marks omitted)); *S.E.C. v. Bronson*, 14 F. Supp. 3d 402, 404 n.1 (S.D.N.Y. 2014) ("'Penny stocks' are securities issued by small companies that trade at less than $5 per share.  Penny stocks are not typically sold on securities exchanges, but rather are traded in an over-the-counter market." (citation omitted)).  The language of Judge Friendly from *Exchange National Bank of Chicago* repeated in *Reves* is best understood in context to refer to instruments like commercial or consumer loans that are secured by a lien on a small business or some of its assets.  It is not meant to immunize small companies from the securities laws.  Here, Plaintiffs do not attach the 2008 and 2009 notes that they are suing on or describe their terms; even if the notes were issued by a business that was "small" at the time of issuance, there are no allegations that they had a short term or that they bore a resemblance to a consumer or commercial transaction such as to take them outside the scope of the securities laws.

Plaintiffs have not made any allegations that they are unable to obtain the facts necessary to plead whether or not the instruments they purchased and possessed fall outside the scope of the protection of the federal securities laws.  Although they claim no longer to have the 2009 note, the Amended Complaint quotes from it.  Am. Compl. ¶ 80.  Moreover, each of the alleged instruments is in an amount of over $100,000.  It is implausible that, even if Bongiorno is no longer in possession of the 2008 and 2009 notes, he is unaware of their basic terms sufficient to plead them.  He also was the CEO of SDRI, Inc. when at least one of the promissory notes was issued.  There is thus no basis to excuse him from the obligation, incumbent upon any litigant, to plead facts supporting his claim and not just "labels and conclusions."  *See Iqbal*, 556 U.S. at

678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" (alteration in original) (citations omitted) (quoting *Twombly*, 550 U.S. at 555, 557)).

Plaintiffs' RICO claim must be dismissed without prejudice as being barred by the PSLRA.  The failure of Plaintiffs to allege any facts to rebut the presumption that the notes are securities is fatal.  "[A]t the outset of a lawsuit," a plaintiff ordinarily must plead "what the plaintiff must prove in the trial at its end."  *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 303 (2d Cir. 2021) (quoting *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020)).  That injunction is as important in the RICO context as elsewhere.  Were it otherwise and a plaintiff is able to avoid the PSLRA bar by the expedient of avoiding mentioning the terms of the instrument upon which he is suing and simply making conclusory allegations of a loan, Congress's purpose would be defeated and the defendant would be subject to the in terrorem effect of RICO treble damages that Congress—by passing the statute— intended to avoid.  Under *Twombly* and *Iqbal*, more is required.  Having pled a claim based on promissory notes, the burden is on Plaintiffs to plead the facts that would support a plausible inference those notes are not securities.  *See, e.g.*, *Patane v. Clark*, 508 F.3d 106, 111 (2d Cir. 2007) ("In order to withstand a motion to dismiss, a complaint must plead "*enough facts* to state a claim for relief that is plausible on its face.'" (emphasis added) (quoting *Twombly*, 550 U.S. at 570)).

Further, even though Plaintiffs allege that the theft of stock serves as a RICO predicate, courts in this District have held that "if any one of the predicate acts involves the purchase or sale of securities, the entire claim is foreclosed by the securities fraud bar codified in the RICO

statute." *EIG Energy Fund XIV, L.P. v. Keppel Offshore & Marine Ltd.*, 2020 WL 2319127, at

*7 (S.D.N.Y. May 11, 2020) (quoting *Zohar*, 286 F. Supp. 3d at 638); *see also Great W. Ins. Co.*

*v. Graham*, 2020 WL 3415026, at *37 (S.D.N.Y. June 22, 2020) ("Where plaintiffs allege a

single scheme, courts have held that if any predicate act is barred by the PSLRA it is fatal to the

entire RICO claim." (internal quotation marks omitted)).

The RICO claim is dismissed without prejudice since Plaintiffs have not alleged facts to

overcome the *Reves* presumption.

### 2.      Failure to Allege Fraud with Particularity

Defendants argue, in the alternative, that Plaintiffs' RICO claim should be dismissed for

failing to allege the predicate acts of mail fraud and wire fraud with particularity.

"To sustain a RICO claim under 18 U.S.C. § 1962(c), a plaintiff must show '(1) that the

defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of

"racketeering activity" (5) directly or indirectly invests in, or maintains and interest in, or

participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign

commerce.'" *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 123-24 (2d Cir. 2018) (quoting

*Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983)); *see also Anatian v. Coutts Bank*

*(Switz.) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999) ("To state a RICO claim, a plaintiff must plead '(1)

conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity'" as well as "injury

to business or property as a result of the RICO violation." (quoting *Sedima, S.P.R.L. v. Imrex*

*Co.*, 473 U.S. 479, 496 (1985))).

RICO defines racketeering activity to mean "any act which is indictable" under specified

provisions of Title 18, including, as relevant here, mail fraud and wire fraud.  18 U.S.C. §

1961(1)(B).  "The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or

property (iii) furthered by the use of interstate mail or wires." *Williams v. Affinion Grp., LLC*,

889 F.3d 116, 124 (2d Cir. 2018) (quoting *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)).  "The gravamen of the offense is the scheme to defraud." *Id.* (quoting *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016)).  "A scheme to defraud is a plan to deprive a person of something of value by trick, deceit, chicane or overreaching." *Id.* (internal quotation marks omitted).  "To make out such a scheme, a plaintiff must provide proof of a material misrepresentation." *Id.*  "Given the routine use of mail and wire communications in business operations, . . . 'RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (quoting *Efron v. Embassy Suites (Puerto Rico), Inc.,* 223 F.3d 12, 20 (1st Cir. 2000)).

The elements of mail and wire fraud must be pled with particularity under Federal Rule of Civil Procedure 9(b).  *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *Benedict v. Amaducci*, 1995 WL 413206, at *6 (S.D.N.Y. July 12, 1995) ("Where, as here, plaintiffs' RICO claims rely in part on mail and/or wire as alleged predicate offenses, Rule 9(b)'s heighted pleading requirements also apply.").  To be pled with particularity, "[t]he complaint must detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams*, 889 F.3d at 124.  "[A]lthough Rule 9(b) permits knowledge to be averred generally, we have repeatedly required plaintiffs 'to plead the factual basis which gives rise to a "strong inference" of fraudulent intent.'" *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (quoting *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990)).  "Essentially,

while Rule 9(b) permits scienter to be demonstrated by inference, this 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.'" *Id.* (quoting *Wexner*, 902 F.2d at 172). "An ample factual basis must be supplied to support the charges." *Id.*; *see also Coppelson v. Serhant*, 2021 WL 148088, at *6 (S.D.N.Y. Jan. 15, 2021) ("Allegations that are 'conclusory and unsupported by assertions of fact' are not sufficient to meet the Rule 9(b) standard." (quoting *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986))).

Plaintiffs allege that the three promissory notes at issue were induced and executed by mail and/or wire fraud. Am. Compl. ¶¶ 72-94. This alleged promissory-note scheme forms the basis for three of four predicates that support Plaintiffs' RICO claim. *Id.* ¶ 71.

With respect to the first promissory note, Plaintiffs allege that on an August 2008 phone call, "[t]he inducement for the loan was the false claim by [Baquet] that it was a 'first lien on the Brenon Property' ie. [sic] the note was secured by the said property" and that Baquet represented "that the note would be repaid in six months from the anticipated sale or mortgaging of the Brenon property which Dr. Bongiorno was assured by Baquet had an appraised value of $8,000,000.00." *Id.* ¶ 72. Bongiorno agreed to the loan, "relying on the false representation the property was valued at $8,000,000.00." *Id.* ¶ 73.

Plaintiffs make similar allegations regarding the second promissory note. *Id.* ¶¶ 79-86. On an April 2009 phone call, *id.* ¶ 79, Baquet and Delape "falsely claimed" the loan would be secured by the Brenon Property, *id.* ¶ 36. This promissory note allegedly provided: "in the event of a sale of the Brenon Properties, the proceeds of such sale shall be applied first to the repayment of indebtedness held by the mortgagee and second, to the payment of the amounts due under this note . . . proceeds after payment of the mortgagee paid on a pro-rata basis, if not in

full." *Id.* ¶ 80.  Again, in loaning the money, Bongiorno "rel[ied] on the false representation the property was valued at $8,000,000.00." *Id.* ¶ 81.

Plaintiffs allege that the third promissory note was discussed on a phone call between Bongiorno and Baquet in December 2014. *Id.* ¶ 87.  Plaintiffs do not allege that any false or fraudulent statements were made on that phone call. *Id.*  But Plaintiffs allege that Bongiorno "had continued to rely on the false representation the property was valued at $8,000,000.00 when he made these series of loans." *Id.* ¶ 89.

Regarding the appraisal of the Brenon Property, Plaintiffs allege that the appraisal "was not seen" and was obtained by Kiibler, "the right-hand man" of Delape, *id.* ¶ 72, in 2007, *id.* ¶ 76.  They allege that Baquet and Delape "knew this valuation was severely excessive and false" and "knew that the value of the property was insufficient to pay off the loans secured by same." *Id.* ¶ 72.  They also allege that this figure was used at the 2007 sales pitch in Panama and that Baquet and Delape "at that Panama sales pitch, never revealed to [Bongiorno] and other investors that [Kiibler] worked for [Delape], that there was in fact no qualified appraisal on the Brenon property." *Id.* ¶ 76.  Plaintiffs further allege that Baquet and Delape "never advised [Bongiorno] and the other investors what qualifications [Kiibler] had or lacked to do the appraisal." *Id.* ¶ 82.  Similar allegations were repeated in reference to each promissory note. *See id.* ¶¶ 76, 82, 90.

Plaintiffs allege that "[c]onveyance of the Brenon property without remuneration to [Bongiorno] demonstrates fraud." *Id.* ¶ 38.  In 2018, Bongiorno allegedly learned in a phone call with Baquet that the "Brenon property had been sold in 2017 for $650,000.00, substantially less than the previously claimed value of $8,000,000.00," that "[Baquet] and Delape had no intention

of repaying the loans," and that "the proceeds of the sale were being used as 'operating expenses.'"[16]  *Id.* ¶ 75.

The Amended Complaint fails to allege mail fraud and wire fraud with the particularity required by Rule 9(b).  Among their allegations about the representations made regarding the notes, Plaintiffs only identify two types of false statements made by either Baquet or both Baquet and Delape: (1) that the loans were secured by the Brenon Property, and (2) that the property was appraised to be worth $8 million.  With respect to the appraisal, the Amended Complaint provides only vague allegations and does not supply sufficient detail about the allegedly false statements.  And for both of the identified false statements, "[P]laintiffs cannot rest on their say-so that these statements are fraudulent; they must explain why."  *Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004).  By failing to do so, they do not meet the pleading requirement of Rule 9(b).

Plaintiffs do not explain why the representations that the loans were secured by the Brenon Property were fraudulent.  "[P]laintiffs must do more than simply assert that a particular statement is false or misleading; rather they must demonstrate with specificity why and how that is so."  *Woolgar v. Kingstone Cos., Inc.*, 2020 WL 4586792, at *10 (S.D.N.Y. Aug. 10, 2020) (internal quotation marks omitted).  That Plaintiffs were not paid from the sale of the Brenon Property does not demonstrate that these representations were fraudulent.  "Plaintiffs 'proceed from the proposition that since certain future acts did not come to pass, defendants never intended to accomplish them. . . . Such an allegation is merely conclusory.'"  *Benedict v.*

---

[16] The allegations about this phone call were repeated worded slightly differently in a different part of the Amended Complaint.  Paragraphs 84 and 91 state that SDRI, Inc. "never had any intention of repaying the loans" and that the proceeds of the sale were being used for "operating capital."  *Id.* ¶¶ 84, 91.

*Amaducci*, 1995 WL 413206, at *7 (S.D.N.Y. July 12, 1995) (quoting *Johnston v. Norton*, 1993 WL 465333, at *17 (S.D.N.Y. Nov. 10, 1993)); *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 180 F. Supp. 2d 444, 453 (S.D.N.Y. 2001) ("The simple fact of nonperformance of a promise is insufficient to raise an inference of fraud.  A contract may be breached for legitimate business reasons. . . . Contractual breach, in and of itself, does not bespeak fraud . . . ."  (internal quotation marks and citations omitted)).  Since Plaintiffs do not plead any other facts for why that representation was false, their allegation of fraudulent representation is simply conclusory.

Regarding the $8 million valuation of the Brenon Property, the Amended Complaint contains only vague allegations that together do not specifically detail exactly what was stated and when it was stated.  *See Coppelson*, 2021 WL 148088, at *7.  For example, it is not clear whether the statements in question were simple statements of belief as to the value of the property or whether the statements mentioned that an appraisal had been conducted by an individual with certain qualifications.  The allegations in the Amended Complaint also do not specify when these statements were made.  Plaintiffs reference the $8 million valuation with regard to each of the three promissory notes, but they do not allege whether that valuation was specifically discussed on the phone calls preceding the exchange of each note or whether Bongiorno was relying on statements made by Baquet and Delape during the 2007 pitch.

Even assuming sufficient detail was alleged regarding the who, what, when, and where, Plaintiffs make only conclusory allegations that Baquet and Delape knew the $8 million valuation of the Brenon Property "was severely excessive and false" and "was insufficient to pay off the loans."  Am. Compl. ¶ 72.  Plaintiffs must plead facts giving rise to a strong inference that Baquet and Delape were aware at the time that the statements were made that they would not be able to sell the Brenon Property for its appraised value and that no funds would be available to

satisfy the debt created under the notes.  But the Amended Complaint does not contain such

facts.  That the Brenon Property sold for $650,000 in 2017 does not mean that the property was

not worth $8 million when it was appraised and, more importantly, does not mean that Baquet

and Delape knew that the property was worth less than that when it was appraised and when the

loans were made.  "At most, Plaintiff[s] then [are] left with unactionable falsity by hindsight:

[Defendants'] statements were false because, as it turned out, the property was not a gold mine

and did not [sell for] as much as hoped."  *Coppelson*, 2021 WL 148088, at *8.

Additionally, the allegations about the circumstances surrounding the appraisal do not

make out a case for fraud.  Plaintiffs allege that the $8 million appraisal of the Brenon Property

was obtained by Kiibler in 2007 and that, at the 2007 Panama sales pitch, Baquet and Delape

never revealed that Kiibler worked for Delape, what qualifications Kiibler had or lacked to do

the appraisal, or that there was no qualified appraisal of the property.  But "[a]n omission cannot

give rise to a claim of mail or wire fraud liability absent a duty to disclose."  *Odyssey Re*

*(London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 302 (S.D.N.Y. 2000).

In their Amended Complaint, Plaintiffs have not identified a duty which required Baquet and

Delape to disclose these details about the appraisal.  Nor do they allege the statements in such

detail and with such particularity to give rise to a plausible inference that the statements made

were misleading by omission.  Thus, "[a]bsent the existence of any such duty to disclose, a mail

fraud claim premised on a material omission must fail."  *Katzman v. Victoria's Secret Catalogue*,

167 F.R.D. 649, 656 (S.D.N.Y. 1996).

It may be that Plaintiffs could allege facts to support a claim that the appraisal was

knowingly false and that the failure to reveal these details about the appraisal constitute a

material omission.  But Plaintiffs have not done so in their Amended Complaint.  All that they

allege that they received an appraisal where no representations were made as to that person's qualifications and that the appraisal from 2007 stated a value that ten years later was not able to be realized.  As it stands, their Amended Complaint alleges pure fraud by hindsight.  *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("We have refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight.'").

Furthermore, regarding the third promissory note, the Amended Complaint does not allege that any false representations were made on the December 2014 call between Bongiorno and Baquet.  At most, Plaintiffs allege that Bongiorno "had continued to rely" on the allegedly false $8 million valuation.  *Id.* ¶ 89.  But Plaintiffs do not specify, with respect to the third promissory note, what false representation was made, who made it, when it was made, and where it was made.  *See Rombach*, 355 F.3d at 170 ("This Court has read Rule 9(b) to require that a complaint (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  (internal quotation marks omitted).  Thus, to the extent Plaintiffs allude to a false representation, they have failed to provide sufficient detail to satisfy Rule 9(b).  For this additional reason, Plaintiffs have not pled with particularity that the three promissory notes were induced and executed by mail or wire fraud.

Plaintiffs' remaining RICO predicate is their claim that Baquet and Delape stole stock certificates owned by BBB Land in violation of 18 U.S.C. § 2314 for the interstate transportation of stolen property.  Am. Compl. ¶¶ 99-107.  Although the RICO statute defines racketeering activity to include acts related to the interstate transportation of stolen property, *see* 18 U.S.C. § 1961(1)(B) (listing 18 U.S.C. § 2314), "district courts in this Circuit require plaintiffs who assert Section 1962(c) claims to allege that each defendant committed at least two predicate acts of

racketeering activity." *Ambac Assurance*, 2021 WL 1226984, at *35 (internal quotation marks omitted). Baquet and Delape's single act of alleged stock theft thus cannot support a RICO claim. For this reason, Plaintiffs' RICO claim fails to state a claim.

> **B.      The Remaining State-Law Claims**

Having dismissed Plaintiffs' RICO claim for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court dismisses Plaintiffs' remaining state-law claims without prejudice.

"A district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity,' in deciding whether to exercise jurisdiction." *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). "In weighing these factors, the district court is aided by the Supreme Court's additional guidance in *Cohill* that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (quoting *Cohill*, 484 U.S. at 350 n.7).

The sole asserted basis for federal jurisdiction in this case is Plaintiffs' RICO claim, which has been dismissed for failing to state a claim for relief. The Court thus has dismissed all claims over which it has original jurisdiction and has the discretion under 28 U.S.C. § 1367(c)(3) to decline to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims. In weighing the *Cohill* factors and taking into account the dismissal of Plaintiffs' RICO claim at this early stage of litigation, the Court declines to exercise supplemental jurisdiction over

Plaintiffs' state-law claims.  The remaining state-law claims are therefore dismissed without prejudice.

## IV.     Defendants' Motion for Sanctions

Defendants have also moved for an order sanctioning Plaintiffs and their attorney under Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927 for "willfully filing frivolous RICO allegations" as well as other frivolous claims.  Dkt. No. 87.  Among other arguments, Defendants contend that the RICO claim is "patently frivolous," *id.* at 3, for being barred by the PSLRA and for failure to plead mail fraud and wire fraud with particularity, *id.* at 3-5.  Defendants argue that Rule 11 sanctions are appropriate because "Plaintiffs and Counsel failed to conduct a good faith review of the law before filing the Amended Complaint – even when presented with many of the defects, they have refused to withdraw the claim."  *Id.* at 17.  Defendants also seek sanctions under 28 U.S.C. § 1927 and the Court's inherent authority because, as they contend, Plaintiffs' RICO allegations do not contain a colorable claim, Plaintiffs and their counsel have acted in bad faith by refusing to withdraw the claims, and the only purpose for the refusal to withdraw the claim is to harass the Defendants.  *Id.* at 21.  Above all, Defendants highlight "the most egregious aspect of the Amended Complaint" is the "frivolous RICO claim" and the knowing misrepresentations by Bongiorno and Plaintiffs' counsel that the promissory notes at issue are not securities.  Dkt. No. 98 at 1-2.

"Fed. R. Civ. P. Rule 11 commands that an attorney may not file a pleading until after she is able to certify that to the best of her knowledge 'formed after an inquiry reasonable under the circumstances' that the claims 'are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law' and that 'the factual contentions have evidentiary support.'"  *Sherman v. Fivesky, LLC*, 2020 WL 5105164, at *3 (S.D.N.Y. Aug. 31, 2020) (quoting Fed. R. Civ. P. 11(b)).  "[T]o constitute a frivolous legal

position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is

no chance of success and no reasonable argument to extend, modify or reverse the law as it

stands." *Mareno v. Rowe*, 910 F.2d 1043, 1047 (2d Cir. 1990).  "Thus, not all unsuccessful legal

arguments are frivolous or warrant sanction." *Id.*  Though the arguments presented by Plaintiffs

were not persuasive with respect to the RICO claim, they were "not so untenable as a matter of

law as to necessitate sanction." *Id.* at 1047.  This conclusion also bears on Defendants' request

for sanctions under the Court's inherent power and under 28 U.S.C. § 1927.  *See Revson v.*

*Cinque & Cinque, P.C.*, 221 F.3d 71, 79 (2d Cir. 2000) ("To impose sanctions under either

authority, the trial court must find clear evidence that (1) the offending party's claims were

entirely meritless and (2) the party acted for improper purposes." (alteration omitted)).

　　　　"With regard to factual contentions, 'sanctions may not be imposed unless a particular

allegation is utterly lacking in support.'" *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 388 (2d

Cir. 2003) (quoting *O'Brien v. Alexander*, 101 F.3d 1479, 1489 (2d Cir. 1996)).  "Courts

typically look for statements which rise to the level of direct falsehoods before they find that

sanctions are warranted pursuant to Rule 11(b)(3)." *Safe-Strap Co. v. Koala Corp.*, 270 F. Supp.

2d 407, 412 (S.D.N.Y. 2003).  On the record before it at this time, the Court is not prepared to

find that Plaintiffs' allegations regarding the promissory notes at issue are utterly lacking in

support and rise to the level of direct falsehoods.  If future proceedings reveal evidence to the

contrary, Defendants may again move for sanctions under Rule 11.

　　　　For these reasons, Defendants motion for sanctions is denied.

## V.　　Leave to Amend

　　　　Leave to amend should be "freely give[n] . . . when justice so requires," Fed. R. Civ. P.

15(a)(2), but "should generally be denied in instances of futility, undue delay, bad faith or

dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or

undue prejudice to the non-moving party," *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (quoting *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008)).  While Plaintiffs have already amended their complaint once, they have not done so after a decision from this Court.  Plaintiffs request leave to amend their Amended Complaint.  The Court will permit Plaintiffs an opportunity to replead to address the defects identified.  *See, e.g.*, *Qantel Corp. v. Niemuller*, 771 F. Supp. 1361, 1369 (S.D.N.Y. 1991) (citing *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990), for the proposition that "complaints dismissed pursuant to Rule 9(b) are 'almost always' dismissed with leave to amend").

## CONCLUSION

The motion to strike is GRANTED IN PART AND DENIED IN PART, the motion to dismiss is GRANTED, and the motion for sanctions is DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 66-67, 87, and 101.


SO ORDERED.

Dated: September 20, 2021
    New York, New York

                                                LEWIS J. LIMAN
                                     United States District Judge